FILED
2020 Jun-25  AM 09:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT "1"

# REAL ESTATE PURCHASE
# AND SALE AGREEMENT

*by and between*

## BOMASADA BIRMINGHAM METROPOLITAN LLC

("Seller"),

*and*

## MAXUS METROPOLITAN, LLC

("Purchaser")

*for*

## METROPOLITAN APARTMENTS
## BIRMINGHAM, ALABAMA

Dated August 31, 2018

## TABLE OF CONTENTS

**Page**

1.     AGREEMENT FOR PURCHASE AND SALE. ................................................ 1

2.     PURCHASE PRICE. ........................................................................................ 2

3.     OPTION CONSIDERATION ........................................................................... 2

4.     CLOSING. ........................................................................................................ 3

5.     Intentionally Omitted ...................................................................................... 3

6.     TITLE COMMITMENT AND EXISTING SURVEY. ................................... 3

7.     FINAL SURVEY OBJECTIONS. .................................................................... 5

8.     REPRESENTATIONS AND WARRANTIES. ................................................. 5

9.     SELLER'S COVENANTS. ............................................................................... 8

10.    INSPECTION DATE. ..................................................................................... 10

11.    DELIVERY   OF   OPERATIONAL   INFORMATION   AND   CLOSING
DOCUMENTS. ........................................................................................................ 12

12.    FIRE OR CASUALTY. .................................................................................. 14

13.    CONDEMNATION. ....................................................................................... 14

14.    ADJUSTMENTS AND PRORATIONS. ........................................................ 15

15.    CLOSING COSTS. ......................................................................................... 16

16.    POSSESSION. ................................................................................................ 16

17.    DEFAULT. ..................................................................................................... 16

18.    NOTICES. ...................................................................................................... 17

19.    BROKERS. ..................................................................................................... 17

20.    MANAGEMENT FEES AND EMPLOYEES. ............................................... 18

21.    "AS IS" SALE. ............................................................................................... 18

22.    MISCELLANEOUS. ...................................................................................... 19

23.    EXCHANGE COOPERATION. ..................................................................... 21

i

## REAL ESTATE PURCHASE AND SALE AGREEMENT

**Summary Statement**

This Summary Statement is attached to and made a part of that certain Real Estate Purchase and Sale Agreement by and between the Seller and Purchaser referenced below.

| | | |
|---|---|---|
| 1. | DATE OF AGREEMENT | August 31, 2018 |
| 2. | SELLER: | Bomasada Birmingham Metropolitan LLC |
| 3. | PURCHASER: | Maxus Metropolitan, LLC |
| 4. | PROPERTY DESCRIPTION: | Metropolitan Apartments |
| | Address: | 2900 7th Avenue South, Birmingham, AL  35233 |
| 5. | PURCHASE PRICE: | ████████████████ |
| 6. | EARNEST MONEY: | $25,000 |
| 7. | ADDITIONAL EARNEST MONEY: | N/A |
| 8. | INSPECTION DATE: | N/A |
| 9. | CLOSING DATE: | August 31, 2018, subject to a fifteen day (15) extension as necessary for Lender Approval of Assumption; provided, however, notwithstanding any such extension, the "effective date" of the Closing for all purposes (e.g., prorations) shall be August 31, 2018 |
| 10. | TITLE COMPANY: | TBD |
| 11. | TITLE AGENT | The Title Group Incorporated<br>2101 First Ave. North<br>Birmingham, Al. 35203<br>Attn. Bart T. Crawford<br>(205) 251-8484; (205) 263-8874<br>bcrawford@titlegrp.com |
| 12. | PURCHASER'S ADDRESS: | Maxus Metropolitan, LLC<br>104 Armour Road<br>North Kansas City, MO  64116<br>Phone:  (816) 303-4500<br>Facsimile:  (816) 221-1829 |

Attention:  Adam Fletcher

<u>with a copy to:</u>
Robert B. Thomson
Attorney-at-Law
825 ½ Westport Road
Kansas City, MO  64111
Phone:  (816) 421-2835
Facsimile:  (816) 531-6828

13.   SELLER'S ADDRESS:            Bomasada Birmingham Metropolitan LLC
                                   8980 Lakes at 610 Drive, Suite 200
                                   Houston, TX 77054
                                   Attn.: John L. Gilbert
                                   Email: johngilbert@bomasada.com

                                   <u>with a copy to:</u>
                                   <u>Jackson Walker LLP</u>
                                   1401 McKinney Street, Suite 1900
                                   Houston, TX 77010
                                   Attn.: Alfred M. Myerson
                                   Phone: 713-752-4323
                                   Email: ameyerson@jw.com

14.   BROKERS:                     Seller's Broker: None

                                   Purchaser's Broker: Real Estate Advisors

15.   GOVERNING STATE LAW:         Alabama

16.   ESCROW AGENT:                Assured Quality Title Insurance Company
                                   1001 Walnut
                                   Kansas City, MO  64105
                                   Phone:  (816) 221-2880
                                   Facsimile: (816) 221-2884
                                   Attention: Don Rodgers

ii

## REAL ESTATE PURCHASE AND SALE AGREEMENT

**THIS REAL ESTATE PURCHASE AND SALE AGREEMENT** ("**Agreement**") is made and entered into as of the Date of Agreement set forth on the Summary Statement by and between Bomasada Birmingham Metropolitan LLC, a Delaware limited liability company ("**Seller**"), and Maxus Metropolitan, LLC, a Missouri limited liability company ("**Purchaser**").

## R E C I T A L S:

**A.**     Seller is the owner of certain real property legally described in **Exhibit A** attached hereto (the "**Land**") and all buildings, fixtures and other improvements situated on the Land (collectively, the "**Improvements**"), said Land and the Improvements are described on **Line 4** of the preceding Summary Statement which is attached to and incorporated into this Agreement (the "**Summary Statement**").

**B.**     Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, the Land and the Improvements, together with all of the other property and interests of Seller described in **Section 1** below, subject to the terms and conditions contained herein

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

**1.**     **AGREEMENT FOR PURCHASE AND SALE.**

Seller agrees to sell, and Purchaser agrees to purchase, subject to the terms and conditions contained herein, the Land and the Improvements, together with all of Seller's right, title and interest, if any, in and to:

**(a)**     all rights of way, tenements, hereditaments, easements and appurtenances, including, to the extent owned by Seller, all of Seller's right, title and interest in and to all adjoining streets, alleys, roads, parking areas, curbs, curb cuts, sidewalks, landscaping, signage, sewers and public ways (collectively, the "**Appurtenant Rights**"); and

**(b)**     all furniture, appliances, equipment and fixtures owned by Seller attached to the Improvements or located at and used in connection with the ownership, operation and maintenance of the Land or the Improvements, (collectively, the "**Personal Property**"); and

**(c)**     all leases, tenancies and rental or occupancy agreements granting possessory rights in, on or covering the Land or Improvements, together with all modifications, extensions or amendments thereof, and all security deposits which are unapplied as of the Closing Date (collectively, the "**Leases**"); and

**(d)**     subject to Purchaser's right to require the termination of the Excluded Contracts (as hereinafter defined) in accordance with **Section 9(l)** of this Agreement, to the extent assignable, all contracts including any agreements for streets, parking, utility connections, electric, gas, telephone, cable television, internet, security alarm monitoring, sewer, trash collection or similar services, supply contracts, copiers, if any, affecting the ownership, operation, management and maintenance

1

of the Land, Improvements, Appurtenant Rights, Personal Property and Leases, including without limitation those items listed in **Exhibit C** attached hereto (collectively, the "**Contracts**"), but does not include any existing construction contracts that will be terminated on or before the Closing, or sub-contracts that are related to the Construction Completion Agreement (described below); and

       **(e)**    to the extent assignable, all permits, licenses, franchises, certificates, occupancy and use certificates, permits, authorizations, consents, variances, waivers, approvals and the like from any governmental or quasi-governmental entity or instrumentality affecting the ownership, construction, operation or maintenance of the Land or the Improvements (collectively, the "**Licenses**"); and

       **(f)**    to the extent assignable, all warranties and maintenance records received or to be received, prepared by or on behalf of Seller in connection with the ownership, construction, operation and maintenance of the Property (as defined below), all electronic files, data, worksheets and spreadsheets relating to the operations and leasing activities at the Land and Improvements, and any rights of Seller to the use of the name "Metropolitan Apartments" and all derivations thereof and all trademarks, trade names and signs related thereto, all url's, websites and social media addresses and access codes and all telephone numbers serving the Property which are owned and transferable by Seller (collectively, the "**Intangibles**"). For the sake of clarification, Seller does not have any, nor claim any, rights to the name "Metropolitan Apartments".

The Land, Improvements, Appurtenant Rights, Personal Property, Leases, Contracts, Licenses and Intangibles and other property described above are collectively referred to herein as the "**Property**."

       **2.**      **PURCHASE PRICE.**

      The purchase price for the Property (the "**Purchase Price**") shall be the amount set forth in **Line 5** of the Summary Statement.   The Purchase Price, plus or minus prorations and adjustments provided for herein, shall be paid at Closing by (i) Purchaser's assumption of the outstanding principal amount of Seller's existing permanent loan on the Property from the current lender, Amegy Bank National Association ("**Lender**") in the original principal amount of ▮▮▮▮▮▮▮▮(the "**Loan Assumption**"), subject to such Loan Assumption approval ("**Lender Approval**"), (ii) the funding by Purchaser of a Deposit Account with Lender in the name of Purchaser in the amount of ▮▮▮▮▮▮▮▮to be held and disbursed by Lender in accordance with the loan documents executed by Purchaser in connection with the Loan Assumption, the form of Deposit Agreement attached hereto as **Exhibit D**, and (iii) the payment to Seller of the remaining portion of the Purchase Price in cash or cash equivalent to Seller by wire transfer at Closing on the Closing Date (as hereinafter defined), *plus* post-Closing, Purchaser shall pay Seller a "Profit Participation", if any, as defined in and pursuant to the terms of the Profit Participation Agreement to be signed at Closing.

       **3.**      **OPTION CONSIDERATION.**

      Seller hereby acknowledges receipt of the sum of $100.00 cash (the "**Option Consideration**") from Purchaser, as consideration for execution of this Agreement by Seller. Within two (2) days of the date hereof, Purchaser will deliver to Escrow Agent the Earnest Money to be held in escrow pursuant to the terms of this Agreement. If the purchase and sale of the

Property is consummated pursuant to this Agreement, the Option Consideration and Earnest Money shall be applied toward the Purchase Price paid by Purchaser. If this Agreement is terminated pursuant to a default by Seller hereunder, the Option Consideration and Earnest Money shall be immediately returned by Seller to Purchaser. If this Agreement is terminated for any reason other than a default by Seller hereunder, Seller shall be entitled to retain the Option Consideration.

## 4.    CLOSING.

Subject to terms and conditions of this Agreement, the closing of the transaction contemplated by this Agreement (the "**Closing**") shall take place on the date set forth on **Line 9** of the Summary Statement (the "**Closing Date**") by delivery of closing documents to the offices of the Title Agent, or as the parties shall otherwise agree in writing. If Purchaser receives the Lender Approval, then Purchaser shall have the option to extend the Closing Date for 15 days in if necessary to satisfy Lender requirements, which option must be exercised by written notice to Seller prior to the Closing Date. On the Closing Date, Seller shall transfer and convey title to the Property to Purchaser free and clear of all liens and encumbrances, other than real and personal property taxes not yet due and payable, such title exceptions as may be permitted pursuant to **Section 6** below, liens related to the on-going construction of the Improvements, and in accordance with the Escrow. In the event Lender Approval is not received by Purchaser, this Agreement shall terminate and Purchaser shall be entitled to immediate return of the Earnest Money. Notwithstanding the foregoing, as noted on Line 9 of the Summary Statement, if the Closing Date is delayed or extended for any reason, the "effective date" of the Closing for all purposes will be deemed to be August 31, 2018.

The Loan Assumption, if any, must include the release of Seller and the current guarantors from all liability under the Loan (the "**Release**") as of the Closing Date. In the event the Release is not reasonably satisfactory to Seller, then the sale may be terminated by Seller and the parties shall have no further obligations or liabilities, except for the obligations and indemnities which are expressly intended to survive the termination of this Agreement. Purchaser will submit all necessary applications, fees, expense deposits and documents for the Loan Assumption from Lender and thereafter use its best efforts to obtain Lender Approval of the Loan Assumption. All costs and expenses incurred to obtain Lender Approval of the Loan Assumption shall be borne by Purchaser.

## 5.    ESCROW.

This transaction shall be closed through an escrow established with Title Agent or Title Company in accordance with local custom or as otherwise agreed in writing by Purchaser and Seller (the "**Escrow**"). Except as specifically set forth herein, all escrow costs, including the costs of the Escrow and any closing fees of the Escrow Agent and Title Agent, shall be divided equally between Purchaser and Seller. Escrow Agent will provide Seller with an "insured closing letter" from a title insurance underwriter acceptable to Seller.

## 6.    TITLE COMMITMENT AND EXISTING SURVEY.

Purchaser shall order a current Alabama form title commitment (the "**Title Commitment**") for an owner's "Basic Coverage" title insurance policy issued by the Title Company identified in

**Line 10** of the Summary Statement through the Title Agent identified in Line 11 of the Summary Statement in the amount of the Purchase Price, covering title to the Land, together with legible copies of each of the documents underlying the title exceptions listed in the Title Commitment. The costs of obtaining the Title Commitment will be paid by Seller as provided in **Section 15** hereof.  Purchaser may also acquire, at its expense, such deletions or endorsements to the Title Policy (as hereinafter defined) as may be available in the State where the Property is located (the premium charged by the Title Company for any such additional deletions or endorsements being referred to herein as the "**Special Endorsement Premium**").

Seller has delivered to Purchaser a copy of the existing survey of the Property (the "**Existing Survey**").  Purchaser may order, at Purchaser's expense, an update or recertification of the Existing Survey (the "**Updated Survey**").  The treatment of matters first appearing on the Updated Survey are addressed in **Section 7** of this Agreement.  No later than seven (7) days after receipt of the Title Commitment by Purchaser (such date, the "**Title Objection Date**"), Purchaser will notify Seller in writing (the "**Exception Notice**") as to those title exceptions listed in the Title Commitment and those matters shown on the Existing Survey which it will accept (the "**Permitted Exceptions**").  If Purchaser fails to provide Seller the Exception Notice on or before the Title Objection Date, the title exceptions listed in the Title Commitment and the matters shown on the Existing Survey shall be deemed to be Permitted Exceptions and Purchaser shall be deemed to have waived its right to object to such exceptions. Seller shall have the right, but not the obligation, to remove all (if any) title exceptions other than Permitted Exceptions (collectively, the "**Unpermitted Exceptions**") of record as of the Closing Date.  Seller shall have until the date which is ten (10) days after the date Seller receives the Exception Notice (the "**Title Clearance Date**") to provide written notice to Purchaser of its intention to have all (if any) Unpermitted Exceptions removed of record as of the Closing Date.  If Seller provides notice that it will remove all Unpermitted Exceptions, Seller shall use commercially reasonable efforts to cure all such matters by the Closing Date. If Seller fails to provide the notice described in the foregoing sentence within such ten (10) day period or notifies Purchaser that it is unwilling to remove all Unpermitted Exceptions, then Purchaser shall within seven (7) days thereof, as its sole remedy, have the option (the "**Title Election**") to either (i) terminate this Agreement, whereupon the parties hereto shall have no further obligations hereunder (except for obligations and indemnities which are expressly intended to survive the termination of this Agreement), or (ii) waive such Unpermitted Exceptions and proceed with Closing, without a reduction in the Purchase Price.  Notwithstanding anything to the contrary herein, Seller shall be obligated to remove of record (by payment, bond, or otherwise) all Monetary Liens as of the Closing and, if Seller fails to do so, Purchaser may elect to terminate this Agreement or to proceed with Closing and reduce the Purchase Price by an amount equal to the aggregate amount of all Monetary Liens. As used herein, the term "**Monetary Liens**" means any of the following encumbrances on the Property or any portion thereof:  (a) any mortgage or deed of trust granted or assumed by Seller except for any mortgage, deed of trust or other lien in connection with the Lender's loan being assumed by Purchaser; (b) any judgment lien; (c) any lien for unpaid taxes, assessments, utility, water, sewer or other governmental charges, except to the extent not yet due and payable or otherwise prorated under this Agreement; and (d) any other lien or encumbrance granted or created by Seller that is capable of removal solely by the payment of a definite and ascertainable amount and is not a disputed amount (other than liens related to the construction of the Improvements).  If Purchaser fails to notify Seller of its Title Election within seven (7) days after the Title Clearance Date, Purchaser shall be deemed to have elected to proceed with the Closing, as set forth in subclause (ii) above.

7.     **FINAL SURVEY OBJECTIONS.**  If the Updated Survey reflects any additional encroachments, gaps, gores or other matters not reflected on the Existing Survey, then on or before the date which is seven (7) days after Purchaser's receipt of the Updated Survey, but in no event later than August 15, 2018 (the "Final Survey Objection Date"), Purchaser will notify Seller in writing as to any such additional encroachments, gaps, gores and other matters depicted on the Updated Survey that Purchaser shall not accept (the "Additional Survey Defects").  If Purchaser fails to provide Seller with written notice of any Additional Survey Defects on or before the Final Survey Objection Date, Purchaser shall be deemed to have waived its right to object to matters of survey (and to any related title exceptions raised on the Title Commitment in connection with such survey matters).  Seller shall have the right, but not the obligation, at any time prior to the Closing, to remove the Additional Survey Defects or to have the Title Company commit to insure, at Seller's expense, against any and all loss or damage that may be occasioned by any such Additional Survey Defect.  Within ten (10) days after Seller's receipt of Purchaser's notice of the Additional Survey Defects (the "Final Survey Clearance Date"), Seller shall provide written notice to Purchaser of its intention with respect to the removal or insurance of the Additional Survey Defects.  If Seller provides the written notice described in the foregoing sentence and thereafter fails on or before the Closing Date to have the Additional Survey Defects removed, or in the alternative, to obtain a commitment for title insurance over such Additional Survey Defect, then, in either case, Purchaser shall, as its sole remedy, have the option (the "Final Survey Election") to either (i) terminate this Agreement, and the parties hereto shall have no further obligations hereunder (except for obligations and indemnities which are expressly stated herein to survive the termination of this Agreement), or (ii) proceed with Closing, without a reduction in the Purchase Price, in which case Purchaser shall be deemed to have waived any objection to such Additional Survey Defects.  If Purchaser fails to notify Seller of its Final Survey Election within seven (7) days after the Final Survey Clearance Date, Purchaser shall be deemed to have elected to proceed with the Closing as set forth in subclause (ii) of this Section 7.

8.     **REPRESENTATIONS AND WARRANTIES.**

**(a)**     As used in this **Section 8,** references to "Seller's actual knowledge" shall mean the actual knowledge of Stuart L. Fred, who is familiar with the ownership, operation and leasing of the Property but without any further independent investigation or due diligence; provided further, that "actual knowledge" does not imply the truth or veracity of a representation or warranty herein, but that the Seller's party designated above does not have any actual knowledge that the representation or warranty is inaccurate or false in any material respect.  Seller represents and warrants to Purchaser, as of the date hereof and again on the Closing Date, as follows:

(i)     Except as disclosed in the Title Commitment, there are no persons in possession or occupancy of the Property, or any part thereof, nor are there any persons who have possessory rights with respect to the Property or any part thereof;

(ii)     Neither the execution or delivery of this Agreement, the consummation of the transaction contemplated hereby, nor the fulfillment of or compliance with the terms and conditions hereof (a) conflicts with or results in a material breach of any of the terms, conditions or provisions of any agreement or instrument to which the Seller is a party or by which Seller is bound or (b) results in the creation or imposition of any lien, charge or encumbrance on its property pursuant to such agreement or instrument;

(iii)     There are no contracts or agreements affecting the operation of the Land or the Improvements (including without limitation, management, maintenance, service, supply, purchase, consulting, advertising, promotion, public relations and construction contracts, agreements, commitments, guarantees and warranties) which will survive Closing and be binding upon Purchaser except as disclosed in **Exhibit C** attached hereto and to Seller's actual knowledge, Seller is not in default under any such contracts.  Seller has given Purchaser true and complete copies of such contracts and agreements as they exist in Seller's files. .  Provided, however, the current contract with the architect of record for the Property will not be assigned to Purchaser, and the Purchaser will not be a party to it.   The Purchaser is fully aware of the continuing dispute between the Seller and the architect of record for the Property, and all rights, claims, and causes of action by the Seller against current architect of record, and that exist at the time of Closing, shall remain with the Seller;

(iv)     Except as disclosed on **Exhibit F** attached hereto, there are no claims, causes of action, lawsuits or legal proceedings pending or, to Seller's actual knowledge, threatened, in writing, regarding the ownership, use or possession of the Property, including without limitation mechanic's lien, condemnation or similar proceedings. As a condition of Closing, Seller shall execute an Indemnity Agreement satisfactory with Purchaser, indemnifying the claims identified in Exhibit F;

(v)     Seller is duly organized, validly existing and in good standing under the laws of the state of its organization, and is qualified to do business under the laws of the jurisdiction where the Land is located.  Seller has all necessary power and authority to enter into this Agreement and to consummate all of the transactions contemplated herein.  The individuals executing this Agreement on behalf of Seller (or on behalf of members, managers or partners of Seller) are duly authorized to execute, deliver and perform this Agreement on behalf of Seller (or on behalf of members, managers of partners of Seller) and to bind Seller as provided herein.  This Agreement and all documents to be executed by Seller and delivered to Purchaser hereunder (A) are and will be the legal, valid and binding obligations of Seller, enforceable in accordance with their terms, (B) do not or will not contravene any provision of Seller's organizational documents or any existing laws and regulations applicable to Seller or the Property and (C) will not conflict with or result in a violation of any agreement, instrument, order, writ, judgment or decree to which Seller is a party or is subject or which governs the Property;

(vi)     Seller has received no written notice that the ownership, operation, use or occupancy of the Land or Improvements is in violation of any building, health, fire, zoning or similar law, ordinance, order, regulation or restrictive covenant which has not been cured;

(vii)     Seller has received no written notice of any pending improvement liens or special assessments to be made against the Property by any governmental authority.

(viii)     Seller has not entered into any outstanding contracts for construction on the Land or Improvements, or any portion thereof, which will be outstanding at Closing. At Closing, Purchaser will enter into a Construction Completion Agreement with Bomasada

BHM Construction, LLC, the contractor, for completion of the Improvements pursuant to the terms of the Construction Completion Agreement attached as **Exhibit H** hereto.

(ix)    Seller has no material contracts of employment, management, service, supply, rental or any other type or nature outstanding that affect any part of the Property covered by this Contract or the operation of the Property other than those contracts listed on attached **Exhibit C**.  There are no employees of Seller employed in connection with the use, operation, maintenance or management of the Property whom Purchaser would be obligated to retain or compensate or provide benefits for after the Closing Date.

(x)    To Seller's actual knowledge, except as disclosed on the lease commission payable report to be delivered by Seller to Purchaser at Closing, there are no fees or commissions payable to any person or entity in regard to the Leases and the report sets forth accurately in all material respects the current outstanding balance of all security deposits, key deposits, pet deposits and the like held thereunder, and prepaid rents, if any.

(xi)    Except for the consent of Lender under Seller's financing (which will be assumed by Purchaser at the Closing), no consent or approval of any governmental agency or authority or any third party is required with respect to the execution and delivery of this Agreement by Seller or the consummation by Seller of the transactions contemplated hereby or the performance by Seller of its obligations hereunder.

(xii)    There are no attachments, executions, assignments for the benefit of creditors, receiverships, conservatorships or voluntary or involuntary proceedings in bankruptcy or pursuant to any debtor relief laws contemplated or filed by or against Seller, and Seller has not admitted in writing its inability to pay its debts as they come due or made an offer of settlement, extension or composition to its creditors generally.

(xiii)    Except for that certain Environmental Covenant originally executed by and between Seller and Amegy Bank in favor of the Alabama Department of Environmental Management, a copy of which has been provided to Purchaser, to Seller's actual knowledge, there is no pending or threatened litigation or proceeding before any administrative agency in which any person or entity alleges the presence, release, threat of release, placement on or in the Property, or the generation, transportation, storage, treatment, or disposal at the Property, of any Hazardous Substances in violation of applicable law.  Except as stated above, Seller has not received any written notice of and has no actual knowledge that any governmental authority or any employee or agent thereof has determined that there is a presence, release, threat of release, or placement on or in the Property, of any Hazardous Substances. Seller has not entered into any agreements with any governmental authority or agency (federal, state or local) or any tenant or prior owner of the Property or any owner of any property located near the Property, relating in any way to the presence, release, threat of release, placement on or in the Property, or the generation, transportation, storage, treatment, or disposal at the Property, of any Hazardous Substances.

(xiv)    Seller is not and has never been a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended, and any applicable regulations promulgated thereunder.

(xv)     Neither Seller nor, to Seller's actual knowledge, any of its affiliates or their respective partners, members, shareholders or other equity owners is or will be a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute (including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107-56, commonly referred to as the "USA Patriot Act"), executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action.

All of the representations and warranties of Seller and Purchaser contained in this **Section 8** are material, none shall merge into the deed herein provided for and all shall survive the Closing Date or termination of this Agreement for a period of twelve (12) months (the "**Survival Period**"). Seller shall not be liable for any misrepresentations that Purchaser has learned to be omitted or false during the Inspection Period up to Closing. All rights of Purchaser hereunder with respect to any surviving representation, warranty or covenant shall be deemed waived if Purchaser does not, by written notice to Seller, advise Seller of any alleged breach of representation, warranty or covenant prior to the expiration of the Survival Period. Subject to the limitation set forth in the immediately preceding sentence, all remedies shall be those set forth in **Section 17** below.  If the Closing occurs, then in no event shall Seller have any liability arising pursuant to or in connection with the representations and warranties of Seller under this Agreement (or any document, affidavit or certificate executed or delivered in connection herewith):

(i)     unless the aggregate amount of all such claims exceeds $50,000.00, in which event Seller's liability shall include such $50,000 i.e. shall have so-called "first dollar" liability;

(ii)     Seller's maximum liability for all such claims shall be limited to the Cap as defined in Section 17(b) below; and

(iii)     Unless written notice containing a description of the specific nature of such breach shall have been given by Purchaser to Seller prior to the expiration of the Survival Period.

## 9.     SELLER'S COVENANTS.

From and after the date of this Agreement through the Closing Date, Seller and Seller's agents shall, at Seller's expense:

**(a)**     cause the Property to be constructed, maintained and operated in the ordinary course in accordance with the manner conducted on the Date of Agreement and will keep the Improvements and Personal Property in the same operating condition as on the date hereof (reasonable wear and tear excepted), causing all necessary repairs, renewals and replacements to be made in the ordinary course;

**(b)**     cause payment of all construction costs to contractors, subcontractors and suppliers incurred up to the Closing Date, except for those costs related to on-going work that is covered by and included in the budget that is part of the Construction Completion Agreement;

**(c)**     keep in existence all fire and extended coverage insurance policies, and all public liability insurance policies, that are in existence as of the date of this Agreement with respect to the Property;

**(c)**     Except for an agreed upon lease schedule for apartment units at agreed upon rental rates, Seller will not enter into new lease, license or other occupancy agreement with respect to all or any portion of the Property, or amend, extend or renew any Lease;

**(d)**     subject to the prorations prescribed herein, cause to be either paid or provision for payment agreed upon, in the ordinary course of business all contractors, sub-contractors, trade accounts, costs and expenses of construction, operation and maintenance of the Property incurred prior to Closing;

**(e)**     not, without the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed), remove any tangible Personal Property forming a part of the Property except such that is obsolete or immaterial to the operation of the Improvements or as is replaced by Seller by an article of equal suitability and value, free and clear of any lien or security interest;

**(f)**     unless in the ordinary course of business, not, without Purchaser's prior written consent (which consent shall not be unreasonably withheld or delayed), enter into any contracts of continuing nature (or any renewal, amendment or modification of Contracts) for services, supplies, or materials affecting the Property, that would impose any obligations on Purchaser or the Property after the Closing;

**(g)**     upon at least twenty-four (24) hours' written notice to Seller, permit Purchaser, Purchaser's lender and their respective engineers, architects and other agents, during normal business hours (or such other times as are reasonable), to enter onto the Land for the purpose of making inspections thereof in accordance with **Section 10** hereof, but only so long as Seller's representative is present during all such inspections;

**(h)**     grant Purchaser reasonable access, with forty-eight (48) hours' advance written notice, to any records, books and agreements concerning leasing and operations of the Property within Seller's possession or control (with the exception of any such documents that Seller reasonably deems confidential or proprietary), and maintain such records, books and accounts in Seller's ordinary manner consistent with past practice;

**(i)**     promptly advise Purchaser in writing of any changes in circumstances which would render the representations and warranties made by Seller herein false or misleading in any material respect;

**(j)**     upon written notice from Purchaser on or before Closing, give appropriate notices of termination of Contracts (the **"Excluded Contracts"**) designated by Purchaser (but only to the extent termination is permitted thereunder without a penalty); provided, however, that if the notice period required to terminate such Contracts will not have run prior to Closing, Seller shall assign

and Purchaser shall assume any remaining rights and obligations under such Contracts pursuant to the Assignment and Assumption; and

(k)     cooperate as reasonably requested by Purchaser in order to assist Purchaser in obtaining the Lender Approval.

**10.     INSPECTION DATE.**

Seller shall permit Purchaser to examine, at all reasonable times, all books and records (including operating statements) in Seller's possession or control relating to the leasing and operations of the Property, Purchaser shall have the right, at all reasonable times, so long as Purchaser is with a representative of the Seller present at all times, to (1) inspect the Land, Improvements, Appurtenant Rights and Personal Property, (2) review the Leases, the Contracts, the Licenses and the Intangibles, (3) discuss the Property with, and obtain additional information from, any property manager and (4) conduct geophysical feasibility tests of the Property and environmental audit or audits of the Property, including sampling, and Purchaser shall be given complete access to the Property for the purpose of making such tests, inspections and investigations.   All of the foregoing tests, investigations and studies to be conducted under this **Section 10(a)** by Purchaser shall be subject to the following:

Such tests, inspections and investigations shall take place during normal business hours upon at least 24 hours advance written notice to Seller or its designated agents and Seller's prior written consent in Seller's sole discretion shall be required prior to the performance of any drilling, boring or other invasive testing or procedures;

In the event the Closing does not occur, Purchaser shall promptly return to Seller any documents obtained from Seller or Seller's agents;

Purchaser shall not suffer or permit any lien, claim or charge of any kind whatsoever to attach to the Property or any part thereof as a result of the actions of Purchaser, Purchaser's lender or their respective agents or consultants;

Purchaser shall have no right to discuss any matters involving the Property with any tenants, the on-site management team, governmental agencies or officials without Seller's prior written consent and unless a representative of Seller shall be permitted to participate in each such discussion; and

Such tests, investigations and studies shall be at Purchaser's sole cost and expense and shall not unreasonably interfere with the operation of the Property or with the tenants of the Property.  In the event of any damage to the Property caused by Purchaser, its agents, engineers, employees, contractors or surveyors (including, without limitation, pavement, landscaping and surface damage), Purchaser shall pay the cost incurred by Seller to restore the Property to the condition existing prior to the performance of such tests, investigations or studies.

PURCHASER SHALL DEFEND, INDEMNIFY AND HOLD SELLER HARMLESS FROM ANY AND ALL LIABILITY, COST AND EXPENSE (INCLUDING WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES, COURT COSTS AND COSTS OF APPEAL) SUFFERED OR INCURRED BY SELLER FOR INJURY TO PERSONS OR PROPERTY

CAUSED BY PURCHASER'S INVESTIGATIONS, TESTS, STUDIES AND INSPECTIONS OF THE PROPERTY. Prior to commencing any such tests, studies and investigations, Purchaser shall furnish to Seller a certificate of insurance evidencing comprehensive general public liability insurance on a per occurrence basis, with limits of at least $1,000,000 for bodily or personal injury or death, and property damage insurance in the amount of at least $1,000,000, insuring the person, firm or entity performing such tests, studies and investigations and listing Seller as additional insureds thereunder. The provisions of this **Section 10** shall survive the Closing or the termination of this Agreement.

      **(a)**    If any of the following conditions precedent to Purchaser's obligations under this Agreement is not satisfied, and provided that said non-satisfaction is not due to Purchaser's actions or inactions, Purchaser may, at its option, waive such condition and close this transaction, or, as and in accordance with the applicable provisions of **Section 17** hereof, terminate this Agreement by notice in writing to Seller:

        On the date of Closing, all of Seller's representations and warranties shall have been true and correct in all material respects when made and shall be true and correct in all material respects on the date of Closing, and Seller shall have performed in all material respects each covenant to have been performed by Seller hereunder within the time specified herein. At Closing, Seller has entered into an Indemnity Agreement reasonably satisfactory to Purchaser indemnifying Purchaser for any liabilities under the claims identified in **Exhibit F**.

        On the date of Closing, except for Permitted Exceptions, Seller, its employees, agents and contractors shall not have created or caused any encumbrance or title defect affecting the Land, Improvements or Personal Property which cannot be satisfied at Closing, and title to the Property shall be conveyed to Purchaser subject only to Permitted Exceptions.

        On the date of Closing, there shall be no litigation (including any administrative proceeding) (A) pending which seeks to enjoin the consummation of the sale and purchase hereunder, to recover title to the Property, or any part thereof or any interest therein, or (B) pending or overtly threatened which seeks to enjoin the violation of any law, rule, regulation, restrictive covenant or zoning ordinance that may be applicable to the Land, Improvements or Personal Property.

      **(b)**    All information, data and documents relating to the Property obtained by Purchaser from Seller or any other party or discovered by Purchaser during the term of this Agreement shall be maintained by Purchaser in strict confidence and may not be revealed to any other party except as required by applicable law and to Purchaser's partners, constituent members, employees, advisors, investors, lenders, insurance agents, accountants and attorneys, each of whom shall be informed of the confidential nature of such information and each of whom shall agree to be bound by the provisions of this **Section 10(c)** and **Section 22(n)** hereof; provided that the foregoing restriction shall not apply to information that is available to the general public, and provided further, that the foregoing restriction and the provisions of **Section 22(n)** hereof shall not, and shall not be deemed to, prohibit either party hereto, to the extent necessary to enforce its rights hereunder, from referring to this Agreement or the terms hereof in any pleading filed in connection with any dispute

that may hereafter arise between the parties hereto that relates to this Agreement or the transactions contemplated herein.

## 11. DELIVERY OF OPERATIONAL INFORMATION AND CLOSING DOCUMENTS.

(a)     Seller agrees to provide, to the extent in Seller's possession and to the extent not previously delivered to Purchaser, the documents described on attached **Exhibit G** hereto within three (3) days from the Date of Agreement. If the transaction contemplated hereby does not close for any reason, then all information, documents and materials furnished by Seller shall be returned promptly to Seller (which obligation shall survive the termination of this Agreement).

(b)     The parties shall have three (3) day's notice of the Closing Date to prepare closing documents. On the Closing Date, Seller shall deliver the following documents (the "**Closing Documents**") to Purchaser, all duly executed, where appropriate, each of which shall be a condition precedent to Purchaser's obligation to close the transaction contemplated by this Agreement (and one or more of which may be waived in writing by the Purchaser, in its sole discretion, on or prior to the Closing Date):

(i)     a recordable statutory warranty deed, in the form of **Exhibit E-1** attached hereto, subject only to the Permitted Exceptions, executed by Seller, that conveys fee simple title to the Land, Improvements and Appurtenant Rights to Purchaser;

(ii)     an ALTA 2006 "Basic Coverage" form of Owner's Policy of Title Insurance (the "Owner's Title Policy"), to be issued by the Title Company through the Title Agent promptly after Closing (provided the Title Company shall be unconditionally obligated to issue the Owner's Title Policy as of the Closing), in the full amount of the Purchase Price, dated as of the Closing Date, insuring Purchaser's fee simple title to the Land and Improvements to be good and indefeasible subject only to Permitted Exceptions;

(iii)     a bill of sale, in the form of **Exhibit E-2** attached hereto, executed by Seller, that transfers the Personal Property to Purchaser;

(iv)     an assignment and assumption, in the form of **Exhibit E-3** attached hereto, executed by Seller, that transfers all of Seller's right, title and interest in and to the Contracts, the Licenses, the Leases and the Intangibles to Purchaser (the "**Assignment and Assumption**"), together with any specific assignments of construction warranties or guaranties included in the Property;

(v)     to the extent required by the Title Company, an owner's affidavit in customary form, executed by Seller, sufficient for the Title Company to issue, without extra charge, an owner's policy of title insurance free of any exceptions for unfiled mechanics' or material men's liens for work performed by Seller prior to Closing (except for on-going work, since the construction of the Improvements is in process and will not be complete until after the Closing), or for rights of parties in possession other than pursuant to the Leases or as provided in Permitted Encumbrances;

(vi)     Seller's counterpart of a closing and proration statement, executed by Seller;

(vii)   a certification of nonforeign status satisfying Section 1445 of the Internal Revenue Code of 1986, as amended, executed by Seller;

(viii)   evidence of Seller's existence and authority to perform its obligations under this Agreement, in form and substance reasonably satisfactory to Purchaser and Title Company;

(ix)   the original Leases, Contracts and Licenses in possession of Seller, Purchaser agrees to transmit or otherwise deliver evidence of termination of Contracts designated by Purchaser, if applicable, or as otherwise required hereunder;

(xi)   all keys in Seller's possession or control to all locks on the Improvements;

(xiii)   effective upon receipt and disbursement of the Purchase Price in accordance with any closing statement prepared in connection with this Agreement, evidence of satisfaction and release of any Monetary Liens encumbering the Property;

(xiv)   the documents required to be executed by Seller in connection with the Loan Assumption, if any, and the Release;

(xv)   the Indemnity referenced in Section 8(a)(iv) of the Agreement;

(xvi)   the Construction Completion Agreement executed by Bomasada BHM Construction LLC;

(xvii)   the Profit Participation Agreement, Deposit Agreement, and Shadow Management Agreement each of which is in form and substance approved by Seller; and

(xviii)   such other documents, instruments or agreements as may be required by law or reasonably requested by Purchaser in order to consummate this Agreement.

(c)   On the Closing Date, Purchaser shall deliver the following to Seller, in form and substance reasonably acceptable to Seller, all duly executed where appropriate, each of which shall be a condition precedent to Seller's obligation to close the transaction contemplated by this Agreement:

(i)   counterparts of the Assignment and Assumption, executed by Purchaser;

(ii)   counterparts of the statutory warranty deed executed by Purchaser;

(iii)   counterparts of the closing and proration statement, executed by Purchaser;

(iv)   a certified copy of the resolutions or consent of Purchaser authorizing the transaction contemplated by this Agreement or other satisfactory evidence of authorization;

(v)   to the extent required by the Title Company and Title Agent, affidavits as are customary for the closing of real estate transactions in Alabama;

(vi)   the Purchase Price, plus or minus prorations and adjustments;

(vii)   the documents required to be executed by Purchaser in connection with the Loan Assumption, if any;

(viii)   a counterpart of the Construction Completion Agreement;

(ix)   counterparts of the Profit Participation Agreement, Deposit Agreement, and Shadow Management Agreement each of which is in form and substance approved by Purchaser; and

(x)   such other documents, instruments or agreements as may be required by law or reasonably requested by (d) Seller, in order to consummate this Agreement or (e) Title Company and Title Agent, in order to issue the Title Policy free of any exceptions raised due to the actions of Purchaser, and to otherwise consummate the Closing.

## 12.   FIRE OR CASUALTY.

In the event of damage to the Property by fire or other casualty prior to the Closing Date, Seller shall promptly notify Purchaser of such fire or other casualty.  If the fire or other casualty is uninsured or causes damage which would cost in excess of Four Hundred Thousand Dollars ($400,000.00) to repair (as determined by Seller and Purchaser in good faith), then Purchaser may elect, by written notice to be delivered to Seller on or before the earlier of (i) the twentieth (20th) day after Purchaser's receipt of such notice or (ii) the Closing Date, to either:  (a) close the transaction contemplated by this Agreement and receive all insurance claims and proceeds payable to Seller as a result of such fire or other casualty, with the same being paid or assigned to Purchaser at Closing and Purchaser shall receive a credit at Closing for any deductible amount under the applicable insurance policies or (b) terminate this Agreement, in which case the parties hereto shall have no further obligations hereunder (except for obligations and indemnities which are expressly intended to survive the termination of this Agreement).  If the damage to the Property by fire or other casualty prior to the Closing Date would cost less than Four Hundred Thousand Dollars ($400,000.00) to repair (as determined by Seller and Purchaser in good faith), Purchaser shall not have the right to terminate its obligations under this Agreement by reason thereof, and Seller shall have the right to elect to either repair and restore the Property if such repair or restoration may be completed prior to the Closing Date or to assign and transfer to Purchaser on the Closing Date all of Seller's right, title and interest in and to all insurance proceeds paid or payable to Seller on account of such fire or casualty and Purchaser shall receive a credit at Closing for any deductible amount under the applicable insurance policies.  If any insurance proceeds paid or payable on account of a fire or other casualty are to be assigned to Purchaser in accordance with the provisions of this Agreement, Seller shall cooperate as reasonably requested by Purchaser to effectuate such assignment (including, if necessary, prosecuting claims in Purchaser's name or for Purchaser's benefit, and at Purchaser's expense).  The provisions of this **Section 12** shall survive the Closing or the termination of this Agreement.

## 13.   CONDEMNATION.

If, prior to the Closing Date, all or any material part of the Property is taken by condemnation or a conveyance in lieu thereof, or if notice of a condemnation proceeding with respect to the Property is received by Seller (a copy of which notice shall be immediately delivered by Seller to Purchaser), Seller shall promptly notify Purchaser of such condemnation or a

conveyance in lieu thereof.  If the taking or threatened taking involves a material portion of the Property (hereinafter defined), Purchaser may elect, by written notice to be delivered to Seller on or before the earlier of (i) the twentieth (20th) day after Purchaser's receipt of such notice, or (ii) the Closing Date, to terminate this Agreement, and the parties hereto shall have no further obligations hereunder (except for obligations and indemnities which are expressly intended to survive the termination of this Agreement).   If Purchaser elects to close this transaction notwithstanding such taking or condemnation, Purchaser shall be entitled to any award given to Seller as a result of such condemnation proceedings, with the same being paid or assigned to Purchaser at Closing.  As used herein, a "material portion of the Property" means any part of the Property without which the Property cannot be operated in the manner operated on the date hereof, including any material impairment of access to or egress from the Property or parking at the Property, or the taking of any portion of the Property (including any portion of the Property used for parking) that results in a violation of any legal requirements.  If any taking or threatened taking does not involve a material portion of the Property, Purchaser shall be required to proceed with the Closing, in which event Seller shall assign to Purchaser any award given to Seller as a result of such condemnation proceedings.  The provisions of this **Section 13** shall survive the Closing or the termination of this Agreement.

**14.    ADJUSTMENTS AND PRORATIONS.**

Adjustments and prorations with respect to the Property shall be computed and determined between the parties as of 12:01 a.m. on August 31, 2018 (as noted above, the anticipated Closing Date is August 31, 2018, but if it is delayed for any reason, all prorations shall be effective as of August 31, 2018 notwithstanding anything in the Agreement to the contrary) as follows:

(a)    General real estate taxes, special assessments and personal property taxes, including, without limitation, any and all special taxes, charges and assessments on the Property levied or assessed prior to the date of Closing, shall be prorated as of the Closing Date based on the then current taxes (if known, based on final tax bills for such period -- and if not known, based on the most recent tax bills) and the special assessments due and owing prior to Closing, and Seller or Purchaser shall receive a credit at Closing, as appropriate. Municipal taxes are paid in advance for purposes of adjustments and prorations; therefore, Seller shall receive a prorated credit for such municipal taxes.

(b)    On the Closing Date, Seller will deliver to Purchaser in cash, as a credit against the Purchase Price, an amount equal to all security deposits, access key deposits and other similar deposits and fees, as described in **Section 1(c)** hereof, made by tenants which were paid to Seller or its agent by such tenants, and together with a listing of the tenants to which such deposits and interest are owing.

(c)    All amounts payable, owing or incurred in connection with the Property under the Contracts to be assumed by Purchaser under the Assignment and Assumption shall be prorated as of the Closing Date. Any upfront fee or allowance under the assumed Contracts received by Seller shall be credited to Purchaser at Closing.

(d)    All utility deposits, if any, may be withdrawn by and refunded to Seller, and Purchaser shall make its own replacement deposits for utilities as may be required by the respective utilities involved.  Prior to the Closing, Seller shall provide Purchaser, for informational purposes

and without representation or warranty of any kind, a listing of all utility deposits then in place with respect to the Property.  In addition, all rights to any existing deposits that are to be refunded upon issuance of certificates of occupancy for the Improvements shall be retained by Seller.

     **(e)**     The Loan Assumption, if any, shall be effective on the Closing Date, and Purchaser shall be responsible for all interest accruing under the Loan commencing on  the Closing Date. The Release shall be effective on the Closing Date.

     **(f)**     Seller shall pay or discharge at or prior to Closing all leasing commissions payable in connection with new Leases and Lease amendments, extensions and renewals entered into or occurring prior to Closing.  Purchaser shall be responsible for and pay and discharge when due all leasing commissions due in connection with new Leases entered into after the Closing Date.

     **(g)**     Unless provided otherwise hereinabove, such other items as are customarily prorated in a purchase and sale of the type contemplated hereunder shall be prorated as of the Closing Date.

     **(h)**     If any of the above charges, expenses and income are unavailable at the precise Closing Date, a readjustment shall be made by the parties within ninety (90) days after the Closing of these items.

     **(i)**     Each of the provisions of this **Section 14** shall survive the Closing.

## 15.    CLOSING COSTS.

     **(a)**     Seller shall pay:  (i) the costs of recording any releases required to clear title to the Property, (ii) Seller's attorneys' fees and Seller's other expenses in connection with this Agreement and the transactions contemplated hereby, (iii) all of the Commission due Seller's Broker, if any, described in **Section 19** below and one-half of all escrow fees, and (iv) the costs of the Title Commitment and Title Policy in the amount of the Purchase Price.  Purchaser shall pay:  (A) the cost of recording the deed, along with any transfer taxes or documentary stamps or charges., (B) Purchaser's attorneys' fees and Purchaser's other expenses in connection with this Agreement and the transactions contemplated hereby, (C) one-half of all escrow fees, (D) any Special Endorsement Premium, (E) any costs, fees, reserves or other expenses related to Purchaser's obtaining a loan for the Property and for the Loan Assumption and any title insurance premiums for policies or endorsements as required by Lender, and (F) the cost of the Updated Survey.

## 16.    POSSESSION.

Possession of the Property shall be delivered to Purchaser at Closing and funding of the Purchase Price, free and clear of all liens (other than the construction liens described above) and claims other than Permitted Exceptions, in the same condition as it exists on the date of this Agreement, ordinary wear and tear excepted and except as provided in **Sections 12** and **13** hereof. Purchaser shall have the right to inspect the Property prior to Closing to verify that the condition of the Property is as required under this Agreement.

## 17.    DEFAULT.

     **(a)**     If Seller defaults hereunder and fails to cure such default within five (5) days after written notice of such default, or there is a failure of a condition precedent to Purchaser's obligations

hereunder in accordance with **Section 10(b)** hereof, Purchaser's sole remedy shall be to either (a) terminate this Agreement and receive a return of the Earnest Money, in which event each of the parties hereto shall be relieved of any further obligation to the other arising by virtue of this Agreement (except for obligations and indemnities which are expressly stated herein to survive the termination of this Agreement), or (b) if Lender has approved the assumption of the loan by Purchaser, then Purchaser may pursue specific performance of this Agreement.

      **(b)**    Notwithstanding the foregoing or any other provision of this Agreement to the contrary, in no event shall Seller be liable for any actual, special, punitive, speculative or consequential damages or damages in excess of $2,000,000 (the "**Cap**"). None of Seller's partners, members, managers, officers, agents or employees shall have any personal liability of any kind or nature or by reason of any matter or thing whatsoever under, in connection with, arising out of or in any way related to this Agreement and the transactions contemplated herein, and each party waives for itself and for anyone who may claim by, through or under such party any and all rights to sue or recover on account of any such alleged personal liability.

      **(c)**    If Purchaser defaults hereunder and fails to cure such default within five (5) days of written notice of such default, Seller's sole remedy shall be to terminate this Agreement and Seller shall retain the Option Consideration and Earnest Money as liquidated damages in full settlement of all claims at law or in equity against Purchaser (with the exception of claims against Purchaser related to obligations and indemnities which are expressly stated herein to survive the termination of this Agreement). The provisions of this **Section 17** shall survive termination of this Agreement.

## 18.   NOTICES.

      Any notice, demand, request or other communication which either party hereto may be required or may desire to give under this Agreement shall be in writing and shall be deemed to have been properly given if (a) hand delivered (effective upon delivery), (b) sent by a nationally recognized overnight delivery service (effective upon delivery) or (c) sent by facsimile or pdf (effective upon confirmation of transmission), in each case, prepaid and addressed in accordance with **Line 11** or **12** (as applicable) of the Summary Statement or to such other or additional addresses as either party might designate by written notice to the other party. In addition to any form of notice allowed hereunder, all notices may also be made by electronic mail.

## 19.   BROKERS.

      Each of Seller and Purchaser represents and warrants to the other that it has not dealt with any brokers, finders or agents with respect to the transaction contemplated hereby other than the brokers set forth in **Line 13** of the Summary Statement (the "**Brokers**"). Purchaser agrees to pay, at Closing all of the commission due Purchaser's Brokers. Each party agrees to indemnify, defend and hold harmless the other party, its successors, assigns and agents, from and against the payment of any commission, compensation, loss, damages, costs, and expenses (including without limitation attorneys' fees and costs) incurred in connection with, or arising out of, claims for any broker's, agent's or finder's fees of any person claiming by or through such party other than the commission payable to the Brokers. The obligations of Seller and Purchaser under this **Section 19** shall survive the Closing and the termination of this Agreement.

20.    **MANAGEMENT FEES AND EMPLOYEES.**

On the Closing Date, Purchaser shall assume the current management agreement for the Property.  Except as specifically provided otherwise in a separate written agreement, Purchaser is not required to continue the employment of any employees of Seller or any property manager after the Closing Date.  Seller shall satisfy all obligations to all employees, if any, employed by Seller or otherwise in the operation of the Property up to the Closing Date. This provision shall survive the Closing of this Agreement. Notwithstanding the foregoing, at Closing, Seller and Purchaser will enter into a "Shadow Management Agreement" (herein so called) for the Property.

21.    **"AS IS" SALE.**

(a)    EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES OF SELLER SET FORTH HEREIN OR IN ANY OTHER INSTRUMENT OR CERTIFICATE REQUIRED BY THIS AGREEMENT TO BE DELIVERED BY SELLER AT THE CLOSING, PURCHASER ACKNOWLEDGES AND AGREES THAT IT WILL BE PURCHASING THE PROPERTY BASED SOLELY UPON ITS INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY, AND THAT PURCHASER WILL BE PURCHASING THE PROPERTY "AS IS" "WHERE IS" AND "WITH ALL FAULTS", BASED UPON THE CONDITION OF THE PROPERTY AS OF THE DATE OF THIS AGREEMENT, ORDINARY WEAR AND TEAR AND LOSS BY FIRE OR OTHER CASUALTY OR CONDEMNATION EXCEPTED, AND THAT SELLER MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IN RESPECT OF THE PROPERTY.  WITHOUT LIMITING THE FOREGOING, PURCHASER ACKNOWLEDGES THAT, EXCEPT AS MAY OTHERWISE BE SPECIFICALLY SET FORTH ELSEWHERE IN THIS AGREEMENT OR IN ANY OTHER INSTRUMENT OR CERTIFICATE REQUIRED BY THIS AGREEMENT TO BE DELIVERED BY SELLER AT THE CLOSING, NEITHER SELLER NOR ITS CONSULTANTS, BROKERS OR AGENTS HAS MADE ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND UPON WHICH PURCHASER IS RELYING AS TO ANY MATTERS CONCERNING THE PROPERTY.  EXCEPT TO THE EXTENT THAT ANY SUCH CLAIM IS BASED UPON SELLER'S BREACH OF THE EXPRESS REPRESENTATIONS AND WARRANTIES OF SELLER SET FORTH HEREIN OR IN ANY OTHER INSTRUMENT OR CERTIFICATE REQUIRED BY THIS AGREEMENT TO BE DELIVERED BY SELLER AT THE CLOSING, PURCHASER HEREBY RELEASES SELLER FROM ANY AND ALL LIABILITY IN CONNECTION WITH ANY CLAIMS WHICH PURCHASER MAY HAVE AGAINST SELLER AND PURCHASER HEREBY AGREES NOT TO ASSERT ANY CLAIMS FOR CONTRIBUTION, COST RECOVERY OR OTHERWISE, AGAINST SELLER RELATING DIRECTLY OR INDIRECTLY TO THE PROPERTY OR THE EXISTENCE OF ASBESTOS OR HAZARDOUS MATERIALS OR SUBSTANCES ON, OR ENVIRONMENTAL CONDITIONS OF, THE PROPERTY, WHETHER KNOWN OR UNKNOWN.  As used herein, the terms "**Hazardous Substances**" and "**HAZARDOUS MATERIALS OR SUBSTANCES**" mean any of the following in amounts, concentrations or volumes that are in violation of Environmental Laws: (i) hazardous wastes, hazardous substances, hazardous constituents, toxic substances, bacteria or related materials, whether solids, liquids or gases, including but not limited to substances defined as "hazardous wastes," "hazardous substances," "toxic substances," "pollutants," "contaminants," "radioactive materials," or other similar designations in, or otherwise subject to regulation under, the

Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §9601 et seq.; the Toxic Substance Control Act, 15 U.S.C. §2601 et seq.; The Hazardous Materials Transportation Act, 49 U.S.C. §1802; the Resource Conservation and Recovery Act, 42 U.S.C. §9601. et seq.; the Clean Water Act, 33 U.S.C. §1251; the Safe Drinking Water Act, 42 U.S.C. §300f et seq.; the Clean Air Act, 42 U.S.C. §7401 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq.; The Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §136 et seq.; and in any permits, licenses, approvals, plans, rules, regulations or ordinances adopted, or other criteria and guidelines promulgated pursuant to the preceding laws or other similar federal, state or local laws, regulations, rules or ordinance now or hereafter in effect relating to environmental matters (collectively, "**Environmental Laws**"); and (ii) any other substances, constituents or wastes subject to any applicable federal, state or local law, regulation or ordinance, including any Environmental Law, now or hereafter in effect, including but not limited to (A) petroleum, (B) refined petroleum products, (C) waste oil, (D) waste aviation or motor vehicle fuel, (E) asbestos, and (F) mold or other bacteria.  Purchaser acknowledges that having been given the opportunity to inspect the Property, Purchaser is relying solely on its own investigation of the Property and not on any information provided or to be provided by Seller, except for the representations and warranties expressly set forth in **Section 8** hereof.  The provisions of this **Section 21** shall survive the Closing and shall be contained in the deed.

### 22.   MISCELLANEOUS.

(a)   Time is of the essence of each provision of this Agreement.

(b)   This Agreement and all provisions hereof shall extend to, be binding upon and inure to the benefit of the respective heirs, legatees, successors and assigns of the parties hereto. Notwithstanding the foregoing, Purchaser shall not have the right to assign its interest in this Agreement without the express written consent of Seller, provided, however, such consent shall not be unreasonably withheld, conditioned or delayed.  Notwithstanding the foregoing, Purchaser may upon written notice to Seller (but without Seller's consent) assign, no later than 3 days before Closing, its rights under this Agreement to any entity which is directly or indirectly controlled by Purchaser, provided that, with respect to any assignment whether consent is required or not, (a) the assignee of Purchaser shall assume all obligations of Purchaser hereunder, but Purchaser shall remain primarily liable until the Closing occurs for the performance of Purchaser's obligations, and (b) a copy of the fully executed written assignment and assumption agreement shall be delivered to Seller on or before Closing.  Upon any such assignment and/or conveyance of the Property or any portion thereof to the assignee of Purchaser, all disclaimers, waivers, releases, indemnities and other protections afforded Seller by the terms of this Contract, and all covenants, representations, warranties and obligations of Purchaser hereunder, shall apply to and be binding on said assignee.

(c)   Except as provided herein, this Agreement contains the entire agreement between the parties relating to the transactions contemplated hereby and supersedes any prior written or oral agreement of the parties with respect to such subject matter.

(d)   This Agreement shall be governed by and construed in accordance with the laws of the State described in **Line 14** of the Summary Statement.

(e)   If any of the provisions of this Agreement or the application thereof to any persons or circumstances shall, to any extent, be deemed invalid or unenforceable, the remainder of this

19

Agreement and the application of such provisions to persons or circumstances other than those as to whom or which it is held invalid or unenforceable shall not be affected thereby.

   **(f)**   This Agreement and any document or instrument executed pursuant hereto may be executed in any number of counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument.

   **(g)**   From the date hereof through Closing, Purchaser and Seller shall jointly prepare and issue all releases of information relating to the sale of the Property, and any inquiries regarding the transaction contemplated hereby shall be responded to only after consultation with the other party hereto.

   **(h)**   If either party institutes a legal action against the other relating to this Agreement or any default hereunder, the unsuccessful party to such action will reimburse the successful party for the reasonable expenses of prosecuting or defending such action, including without limitation attorneys' fees and disbursements and court costs.  The obligations under this **Section 22(h)** shall survive the termination of this Agreement.

   **(i)**   This Agreement shall not be construed more strictly against one party than against the other merely by virtue of the fact that the Agreement may have been prepared primarily by counsel for one of the parties, it being recognized that both Purchaser and Seller have contributed substantially and materially to the preparation of this Agreement.

   **(j)**   Intentionally Omitted.

   **(k)**   No Personal Liability of Seller's, Managers, Members and Employees.   No constituent, manager or member in or agent of Seller, nor any advisor, trustee, director, officer, employee, beneficiary, shareholder, participant, representative or agent that is or becomes a constituent member in Seller shall have any personal liability, directly or indirectly, under or in connection with this Agreement or any agreement made or entered into under or pursuant to the provisions of this Agreement, or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter, and Purchaser and its successors and assigns and, without limitation, all other persons and entities, shall look solely to Seller's assets for the payment of any claim or for any performance, and Purchaser, on behalf of itself and its successors and assigns, hereby waives any and all such personal liability.  Notwithstanding anything to the contrary contained in this Agreement, neither the negative capital account of any constituent member in Seller (or in any other constituent partner of Seller), nor any obligation of any constituent partner in Seller (or in any other constituent member of Seller) to restore a negative capital account or to contribute capital to Seller (or to any other constituent partner of Seller), shall at any time be deemed to be the property or an asset of Seller or any such other constituent member (and neither Purchaser nor any of its successors or assigns shall have any right to collect, enforce or proceed against or with respect to any such negative capital account of member's obligations to restore or contribute).  The provisions of this Section shall survive the Closing or any termination of this Agreement.

   **(l)**   The Summary Statement attached to this Agreement is hereby incorporated herein and made a part hereof.

   **(m)**   If, under the terms of this Agreement and the calculation of the time periods provided for herein, the Inspection Date, the Closing Date or any other date to be determined under this

Agreement should fall on a day that is not a business day, then such date shall be extended to the next business day. For purposes of this agreement, "**business day**" means any day of the week other than (a) Saturday or Sunday, (b) a day on which banking institutions in Alabama are obligated or authorized by law or executive action to be closed to the transaction of normal banking business, or (c) a day on which governmental or banking functions in Alabama are interrupted because of extraordinary events such as hurricanes, blizzards, power outages or acts of terrorism.

      **(n)**     A facsimile, pdf or photocopy signature on this Agreement, any amendment hereto or any notice delivered hereunder shall have the same legal effect as an original signature.

      **(o)**     Prior to the Closing Date the parties shall keep the terms of this Agreement (including the Purchase Price) confidential and shall not disclose the Purchase Price or any other terms hereof to any third parties, or issue any press releases or similar public statements with respect to this Agreement or the terms hereof, without the other party's prior written consent, which consent shall be in each party's sole discretion; provided, however, that each party may, without obtaining such prior written consent, disclose this Agreement and the terms hereof to its respective managers, members, officers, lenders, employees, attorneys, accountants, appraisers, insurance advisors, consultants and similar third party professionals, provided that each of the foregoing shall hold such information in confidence. After the Closing Date, the parties hereby agree not to issue any press release or similar public statement containing the amount of the Purchase Price, unless the consent of the other party to this Agreement is first obtained, and, in furtherance of the foregoing, Seller agrees to advise Broker not to disclose the amount of the Purchase Price to any third parties without the prior consent of the Purchaser. Notwithstanding the above terms, to the extent that Purchaser or Seller is required to disclose this Agreement or the terms hereof by law, regulation or stock exchange rule or pursuant to a subpoena, court order or other legal proceeding, then: (i) the party with such disclosure obligation (the "**Disclosing Party**") shall notify other party (both by telephone and in writing) within three (3) days of its knowledge of such legally required disclosure, (ii) the Disclosing Party shall cooperate with the other party in any appeal or challenge to such disclosure made by the other party, and (ii) if no protective order or similar relief is obtained, the Disclosing Party shall (a) disclose only that portion of the confidential information that it is legally obligated to disclose, (b) exercise reasonable efforts to obtain reliable assurances that the disclosed information will be kept confidential and (b) exercise reasonable efforts to provide other party with a copy of the information to be disclosed before the same is given to any third party. This Section shall survive the Closing or earlier termination of this Agreement.

**23.**     **EXCHANGE COOPERATION.**

      Purchaser may designate the Property as replacement property, or Seller may designate the Property as relinquished property, in connection with a like kind exchange (an "Exchange") intended to be completely or partially tax deferred under Section 1031 of the Internal Revenue Code and related Treasury Regulations. If either party elects to proceed with such an Exchange, the other party will cooperate in all reasonable respects, and will consent to and join in an assignment, as contemplated under Reg. § 1.1031(k)-(1)(g)(4)(v), by the exchanging party, to a qualified intermediary, of such party's rights and obligations under this Agreement (without relieving the assigning party from any such obligations) subject to the following: (i) the Closing shall not be delayed or affected by reason of any such Exchange; (ii) Purchaser shall not be required to acquire or hold title to any property (other than the Property) for purposes of consummating any Exchange by Seller; (iii) the exchanging party shall pay any additional costs

(including the reasonable attorneys fees) that would not otherwise have been incurred in the absence of its Exchange; and (iv) a party shall not, through its acquiescence in an Exchange by the other party, have its rights under this Agreement affected or diminished in any manner, or be responsible for compliance with or be deemed to have warranted that the other party's Exchange in fact complies with Section 1031 of the Internal Revenue Code of any applicable Tax Regulations or authorities.

### 24.     EXCLUSIVITY

In consideration of the significant time and expense to be devoted by Purchaser to its potential acquisition of the Property, Seller agrees that, from and after the Date of Agreement until the earlier of (a) the Closing Date or (b) the date on which this Agreement is terminated by either party in accordance with its terms, Seller will negotiate exclusively with Purchaser concerning a potential sale of the Property, it will not market the Property for sale or allow other potential purchasers to inspect or tour the Property, other than potential purchasers that have already made an offer on the subject property,  and it has not and will not enter into any agreement to sell the Property to any party other than Purchaser.  If the Closing does not occur due to a breach by Seller of its obligations under this Section, Purchaser shall have all of the rights and remedies described in **Section 17** of this Agreement (including, without limitation, the right to specific performance described therein).

**[Signature Page Follows]**

**IN WITNESS WHEREOF**, this Agreement has been executed as of the date first above written.

**SELLER:**

BOMASADA BIRMINGHAM
METROPOLITAN LLC,
A Delaware limited liability company

By: _____
Name: _____
Its:  Manager

**PURCHASER:**

MAXUS METROPOLITAN, LLC
a Missouri limited liability company

By: _____
Name: _____
Its: _____

**IN WITNESS WHEREOF**, this Agreement has been executed as of the date first above written.

**SELLER:**

BOMASADA BIRMINGHAM
METROPOLITAN LLC,
A Delaware limited liability company

By: _____
Name:_____
Its:  Manager

**PURCHASER:**

MAXUS METROPOLITAN, LLC
a Missouri limited liability company

By: _____
Name: _Ryan Snyder_____
Its: _Manager_____

## **EXHIBIT A**

### **Legal Description**

LOTS 1 AND 2, ACCORDING TO THE METROPOLITAN – BIRMINGHAM SURVEY, AS RECORDED IN MAP BOOK 241, PAGE 87, IN THE PROBATE OFFICE OF JEFFERSON COUNTY, ALABAMA

## EXHIBIT C

## List of Contracts

**Contracts which survive Closing and to be assumed by Purchaser:**

Management – Pegasus Residential
Janitorial – CCM Cleaning
Landscaping – Curb Appeal
Security Patrol – Signal 88
Cable, TV, Internet – Brighthouse
Elevator – Kane
Fire Alarm Monitoring – Fire & Life Safety
Trash Containers – Green Garbology
Valet Trash Pickup – Valet Living
Exterminator – Rogue Pest Control
Key System – HandiTrac
Packaging – Package Concierge
Advertising – Rent Path
Copy Machine – Advanced Business Systems

**Contracts which do not survive the Closing:**

[Insert list of Contracts which don't survive – to be provided]

## EXHIBIT E-1

## STATUTORY WARRANTY DEED

Send Tax Notice to:

## STATUTORY WARRANTY DEED

KNOW ALL MEN BY THESE PRESENTS, FOR AND IN CONSIDERATION of the sum of Ten Dollars ($10.00), cash in hand paid, and other good and valuable consideration, including the assumption and agreement to pay as and when due that certain indebtedness held by _____, as evidenced by the Promissory Note dated _____ in the original principal sum of _____ Dollars ($_____) and secured by that certain Mortgage recorded in Book _____ at Page _____ in the office of the Judge of Probate of Jefferson County, Alabama, the aforesaid indebtedness having a principal balance being assumed by Grantee as of _____, 2018 of _____ Dollars ($_____), the receipt and sufficiency of which are hereby acknowledged,

_____

_____

_____

does hereby grant, bargain, sell, and convey unto

_____

_____

_____

the following described real property situated and located in more particularly described as follows, together with all improvements, and appurtenances thereto, and all rights, ways, servitudes, privileges and advantages appertaining thereto (the "Property"):

See ***Exhibit A*** attached hereto and made a part hereof

The statutory warranty of this conveyance of the Property is made subject to the encumbrances set out and listed in ***Exhibit B*** hereto (the "Encumbrances").

EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES OF GRANTOR SET FORTH HEREIN OR AS PROVIDED IN THAT CERTAIN REAL ESTATE PURCHASE AND SALE AGREEMENT DATED AUGUST ___, 2018 (THE "CONTRACT"), BY AND BETWEEN GRANTOR AND GRANTEE, GRANTEE ACKNOWLEDGES AND AGREES THAT IT IS PURCHASING THE PROPERTY BASED SOLELY UPON ITS INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY, AND THAT GRANTEE IS PURCHASING THE PROPERTY "AS IS" "WHERE IS" AND "WITH ALL FAULTS", BASED UPON THE CONDITION OF THE PROPERTY AS OF THE DATE OF THE CONTRACT, ORDINARY WEAR AND TEAR AND LOSS BY FIRE OR OTHER CASUALTY OR CONDEMNATION EXCEPTED, AND THAT GRANTOR MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, IN RESPECT OF THE PROPERTY.   WITHOUT LIMITING THE FOREGOING, GRANTEE ACKNOWLEDGES THAT, EXCEPT AS MAY OTHERWISE BE SPECIFICALLY SET FORTH ELSEWHERE IN THE CONTRACT OR IN ANY OTHER INSTRUMENT OR CERTIFICATE REQUIRED BY THE CONTRACT TO BE DELIVERED BY GRANTOR AT THE CLOSING, NEITHER GRANTOR NOR ITS CONSULTANTS, BROKERS OR AGENTS HAS MADE ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND UPON WHICH GRANTEE IS RELYING AS TO ANY MATTERS CONCERNING THE PROPERTY. EXCEPT TO THE EXTENT THAT ANY SUCH CLAIM IS BASED UPON GRANTOR'S BREACH OF THE EXPRESS REPRESENTATIONS AND WARRANTIES OF GRANTOR SET FORTH IN THE CONTRACT OR IN ANY OTHER INSTRUMENT OR CERTIFICATE REQUIRED BY THE CONTRACT TO BE DELIVERED BY GRANTOR AT THE CLOSING, GRANTEE HEREBY RELEASES GRANTOR FROM ANY AND ALL LIABILITY IN CONNECTION WITH ANY CLAIMS WHICH GRANTEE MAY HAVE AGAINST GRANTOR AND GRANTEE HEREBY AGREES NOT TO ASSERT ANY CLAIMS FOR CONTRIBUTION, COST RECOVERY OR OTHERWISE, AGAINST GRANTOR RELATING DIRECTLY OR INDIRECTLY TO THE PROPERTY OR THE EXISTENCE OF ASBESTOS OR HAZARDOUS MATERIALS OR SUBSTANCES ON, OR ENVIRONMENTAL CONDITIONS OF, THE PROPERTY, WHETHER KNOWN OR UNKNOWN.  As used herein, the terms "Hazardous Substances" and "HAZARDOUS MATERIALS OR SUBSTANCES" mean (i) hazardous wastes, hazardous substances, hazardous constituents, toxic substances, bacteria or related materials, whether solids, liquids or gases, including but not limited to substances defined as "hazardous wastes," "hazardous substances," "toxic substances," "pollutants," "contaminants," "radioactive materials," or other similar designations in, or otherwise subject to regulation under, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §9601 et seq.; the Toxic Substance Control Act, 15 U.S.C. §2601 et seq.; The Hazardous Materials Transportation Act, 49 U.S.C. §1802; the Resource Conservation and Recovery Act, 42 U.S.C. §9601. et seq.; the Clean Water Act, 33 U.S.C. §1251; the Safe Drinking Water Act, 42 U.S.C. §300f et seq.; the Clean Air Act, 42 U.S.C. §7401 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq.; The Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §136 et seq.; and in any permits, licenses, approvals, plans, rules, regulations or ordinances adopted, or other criteria and guidelines promulgated pursuant to the preceding laws or other similar federal, state or local laws, regulations, rules or ordinance now or hereafter in effect relating to environmental matters (collectively, "Environmental Laws"); and (ii) any other substances, constituents or wastes subject to any applicable federal, state or local law, regulation or ordinance, including any Environmental Law, now or hereafter in effect, including but not limited to (A) petroleum, (B) refined

petroleum products, (C) waste oil, (D) waste aviation or motor vehicle fuel, (E) asbestos, and (F) mold or other bacteria.  Grantee acknowledges that having been given the opportunity to inspect the Property, grantee is relying solely on its own investigation of the Property and not on any information provided or to be provided by Grantor, except for the representations and warranties expressly set forth in Section 8 of the Contract.

TO HAVE AND TO HOLD to the Grantee, its successors and assigns forever.

The Grantor hereby covenants and agrees with Grantee, its successors and assigns, that the Grantor will defend the above described Property against the lawful claims (unless otherwise noted above) of all persons claiming by, through, or under the Grantor, but not further or otherwise.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the Grantor has caused this conveyance to be duly executed on this _____ day of _____, 2018.

**<u>GRANTOR</u>:**

_____

STATE OF
COUNTY OF _____

    I, the undersigned, Notary Public, in and for said county in said state, hereby certify that _____, whose name as _____ of _____, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he/she, as such _____ and with full authority, executed the same voluntarily for and as the act of said limited liability company.

    Given under my hand this _____ day of _____, 2018.

_____
Notary Public
My commission expires:_____

Signature Page
Statutory Warranty Deed

**EXHIBIT A to Deed**

Legal Description

**Exhibit B to Deed**

**ENCUMBRANCES**

1.      Taxes or special assessments for the current year and subsequent years which are not yet due and payable.

2.      Any prior reservation or conveyance, together with release of damages, of minerals of every kind and character, including, but not limited to, oil, gas, sand, and gravel in, on, and under subject property

3.      Rights or claims of tenants in possession not shown by the public records.

4.      All easements and rights of way for public roads, utilities and drainage and all utility and access easements serving the Property conveyed herein.

5.      Encroachments, overlaps, variation in area or in measurements, boundary line disputes, roadways and matters not of record, including lack of access, which would be disclosed by an accurate survey and inspection of the property.

6.      That certain Environmental Covenant originally executed by and between Bomasada Birmingham, LLC and Amegy Bank in favor of Alabama Department of Environmental Management recorded in Book _____, Page _____ of the Probate Office in Jefferson County, Alabama.

7.      [Insert Permitted Encumbrances per the Contract]

**EXHIBIT E-2**

**BILL OF SALE
(NON-RECOURSE)**

**BOMASADA BIRMINGHAM METROPOLITAN, LLC**, a _____ limited liability company ( "**Seller**"), in consideration of the sum of Ten and No/100 Dollars ($10.00), in hand paid, and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, does hereby sell, assign, transfer, and set over to _____, a _____ ("**Purchaser**"), the personal property described on **Schedule 1** attached hereto, presently located on the real estate commonly known as Metropolitan Apartments and legally described on **Schedule 2** attached hereto ("**Real Estate**").

Seller does hereby covenant with Purchaser that at the time of delivery of this Bill of Sale, the Personal Property is free from all encumbrances made by Seller and that Seller will warrant and defend the same against the lawful claims and demands of all persons claiming by, through or under Seller, but against none other.  SELLER HEREBY DISCLAIMS, AND PURCHASER HEREBY WAIVES ANY AND ALL WARRANTIES OF MERCHANTABILITY OR WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE PERSONAL PROPERTY BEING TRANSFERRED BY THIS INSTRUMENT. THE PERSONAL PROPERTY, IS BEING ASSIGNED "AS IS", WHERE IS" AND "WITH ALL FAULTS" AS OF THE DATE OF THIS BILL OF SALE.  PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO THE PERSONAL PROPERTY. PURCHASER ACCEPTS THE PERSONAL PROPERTY IN "AS IS" "WHERE IS" CONDITION AND BASIS WITH ALL FAULTS.   PURCHASER IS HEREBY ACQUIRING THE PERSONAL PROPERTY BASED SOLELY UPON PURCHASER'S OWN INDEPENDENT INVESTIGATIONS AND INSPECTIONS OF THAT PROPERTY AND NOT IN RELIANCE ON ANY INFORMATION PROVIDED BY SELLER OR SELLER'S AGENTS OR CONTRACTORS.

EXECUTED this ____ day of _____, 2018.

**SELLER:**

**<u>Schedule 1 to Bill of Sale</u>**

**<u>PERSONAL PROPERTY</u>**

All furniture, appliances, equipment and fixtures owned by Seller attached to the improvements or located at and used in connection with the ownership, operation and maintenance of the land, excluding computers and software as more particularly described on Schedule 2 to this Bill of Sale or the improvements on such land.

**Schedule 2 to Bill of Sale**

**LEGAL DESCRIPTION**

**EXHIBIT E-3**

**ASSIGNMENT AND ASSUMPTION**

For and in consideration of the sum of Ten and No/100 Dollars ($10.00), in hand paid, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, **BOMASADA BIRMINGHAM METROPOLITAN, LLC**, a _____ limited liability company ("**Assignor**"), hereby sells, transfers, conveys, assigns and sets over unto _____ ("**Assignee**"), the following described property (collectively, the "**Assigned Property**"):

(1)     All of Assignor's right, title and interest, as lessor, in and to all leases, licenses and other agreements (collectively, "**Leases**") to occupy all or any portion of the real estate commonly known as Metropolitan Apartments, and legally described on **Schedule 1** attached hereto (the "**Property**"), including without limitation, the Leases listed on **Schedule 2** attached hereto together with all rents due, or to become due under each such lease, license and agreement on or after the date hereof and all guaranties by third parties of the tenants' obligations thereunder; and

(2)     all refundable lease security deposits under the Leases (to the extent sums are being paid to Assignee on the date hereof); and

(3)     to the extent assignable, all of Assignor's right, title and interest in and to all those contracts, agreements, telecommunications agreements, guarantees, warranties and indemnities (including, without limitation, for workmanship, materials and performance) and which exist or may hereafter exist against any contractor, subcontractor, manufacturer or supplier or laborer or other services relating thereto as any of such relate to the Property, written or oral, affecting the ownership, operation, management and maintenance of the Property listed on **Schedule 3** attached hereto (collectively, the "**Contracts**"); and

(4)     to the extent assignable, all of Assignor's right, title and interest in and to all to licenses, franchises, certificates, occupancy and use certificates, permits, authorizations, consents, variances, waivers, approvals and the like from any federal, state, county, municipal or other governmental or quasi-governmental body, agency, department, board, commission, bureau or other entity or instrumentality affecting the ownership, operation or maintenance of the Property; and

(5)     to the extent assignable, all of Assignor's right, title and interest in and to all designs, plans, drawings, specifications, and other intangible property used by Assignor in connection with the ownership, operation and maintenance of the Property.

Assignor does hereby covenant with Purchaser that at the time of delivery of this Assignment and Assumption, the Leases and Contracts are free from all encumbrances made by

Assignor, other than the lien of the existing loan being assumed by Assignee and that Assignor will warrant and defend the same against the lawful claims and demands of all persons claiming by, through or under Assignor, but against none other.  Except as to the special warranty of title and any representation and warranty expressly set forth in the Real Estate Purchase and Sale Agreement dated August__, 2018 between Assignor and Assignee (the "**Agreement**"), the Assigned Property is conveyed "as is", "where is" and Assignor makes no other warranty with respect thereto.

Subject to the foregoing, and subject to the provisions of **Sections 8(c)** and **17** of the Agreement, Assignor hereby agrees to indemnify, defend and hold Assignee harmless from and against any and all claims, losses, costs, damages and obligations (collectively, "**Claims**"), to the extent any such Claim (i) results from the breach by Seller of any representation or warranty contained in the Agreement, and (ii) arises on or prior to the date hereof under the Leases and the Contracts assigned to Assignee by this instrument.  Assignee hereby agrees to indemnify, defend and hold Assignor harmless from and against any and all claims, losses, costs damages and obligations (collectively, "Claims") to the extent any such Claim (i) results from the breach by Purchaser of any representation or warranty contained in the Agreement, and (ii) arises after the date hereof under the Leases and the Contracts assigned to Assignee by this instrument.

This Assignment and Assumption shall be (a) binding upon, and inure to the benefit of, the parties to this Assignment and Assumption and their respective heirs, legal representatives, successors and assigns, and (b) construed in accordance with the laws of the State of Alabama, without regard to the application of choice of law principles.

The parties may execute this Assignment and Assumption in one or more identical counterparts, all of which when taken together will constitute one and the same instrument.  If so executed, each of such counterparts is to be deemed an original for all purposes, and all such counterparts shall, collectively, constitute one agreement, but in making proof of this Assignment and Assumption, it shall not be necessary to produce or account for more than one such counterpart.

Neither this Assignment and Assumption nor any term, provision, or condition hereof may be changed, amended or modified, and no obligation, duty or liability or any party hereby may be released, discharged or waived, except in a writing signed by all parties hereto.

EXECUTED this ____ day of _____, 2018.

**ASSIGNOR:**

**ACCEPTANCE**

        Assignee hereby accepts the foregoing assignment as of the date hereof and as of such date hereby assumes the performance of all the terms, covenants and conditions of the Assigned Property, including, without limitation, the obligation to return the refundable lease security deposits under the Leases to the extent the same are received as a credit at Closing, with respect to the period from and after the date hereof, and Assignee does further hereby agree to indemnify, defend and hold Assignor harmless from and against any and all losses, costs, claims, obligations and damages arising under or related to the Assigned Property on or after the date hereof.

        Date:_____, 2018

                          **ASSIGNEE:**

                          _____

                          a _____

                          By: _____
                                _____,
                          Its _____

**Schedule 1 to Assignment and Assumption**

**LEGAL DESCRIPTION**

**Schedule 3 to Assignment and Assumption**

**CONTRACTS AND TELECOMMUNICATIONS AGREEMENTS**

**EXHIBIT F**

**Disclosure of Legal Compliance Matters**

1.      Slip and fall notice by a subcontractor's employee.  Turned over to our insurance.

2.      Subcontractor Issues - various M&M liens as should be shown on a current title report, including:

        a.      Southern Carlson
        b.      Sunbelt Rentals
        c.      Five Star
        d.      Gainesville Winnelson

3.      LAS (Architects of record)

## EXHIBIT G

**DOCUMENTS DELIVERED BY SELLER**
**(to the extent in Seller's possession)**

- Tax bills and paid receipts for the last three (3) years and any current year tax assessment or valuation information

- Copies of any building plans and specifications in Seller's possession, without representation or warranty as to deviations thereof in the actual construction

- Current Phase 1 Environmental studies and testing reports on soils for the Property, if available

- Current "As Built" Survey

- Copies of all contracts for all services on the Property (but excluding all construction related contracts)

- All construction warranties and guarantees for work performed or supplies used in construction

- Copy of the current title report, including a legal description, and one copy of all documents listed as exceptions to the title report

- Current insurance policies or written insurance quotes

- Flood plain letter

- Personal property inventory

- Copies of all leases (to be reviewed on the Property)

**EXHIBIT H**

**Construction Completion Agreement**

## CONSTRUCTION COMPLETION AGREEMENT

This Construction Completion Agreement ("Agreement") is made and entered into this 31 day of August 2018, by and between Bomasada BHM Construction, LLC ("Contractor") and Maxus Metropolitan, LLC ("Owner").

## RECITALS:

WHEREAS, Bomasada Birmingham Metropolitan, LLC (the "Prior Owner") and Contractor entered into a construction contract for the construction of a multifamily project located at 2900 7th Avenue South, Birmingham, Alabama 35233 (the "Project");

WHEREAS, the Prior Owner and the Owner entered into a Real Estate Purchase and Sale Agreement (the "PSA") whereby the Owner purchased the Project from the Prior Owner; and

WHEREAS, at the time of sale the Project was not completed; and

WHEREAS, Contractor and Owner hereby enter into this Agreement for the Contractor to complete construction of the Project as set forth herein.

NOW, THEREFORE, in consideration of the premises, other good and valuable considerations, and the mutual covenants set forth herein, the receipt and sufficiency of all of which are hereby acknowledged, the parties hereto agree as follows:

1.    Effectiveness. Notwithstanding the date of the execution of this Agreement, this Agreement shall be conditioned upon and shall not be effective or in force until the execution of the PSA and the closing of the sale of the Project from Prior Owner to Owner (the "Closing"). If this Agreement is executed by Owner and Contractor prior to the Closing, the "Effective Date" of this Agreement shall be the same as the date of the Closing. Otherwise, the Effective Date shall be the day the last party signs this Agreement. The failure of the Owner and Prior Owner to close shall render this Agreement null and void and of no effect. Upon Closing, the Owner shall issue a notice to date proceed (the "Notice to Proceed") to Contractor as set forth in Section 12 below.

2.    Completion Price. The Contractor agrees to complete construction of the Project for the price of ███████ (the "Completion Price"). The Completion Price shall be the sum of the following (1) the ███████ deposited with Amegy Bank ("Lender") as set forth in Paragraph 2 of the PSA (the "Deposit") and in accordance with the Deposit Agreement between Prior Owner and Owner dated effective as of even date herewith, plus (2) the outstanding amount remaining for funding on the Prior Owner's construction loan with Lender, which is currently ███████ (the "Loan").

3.    Completion Work. The "Completion Work" means the work required to fully complete the construction of the Project as outlined and described on Exhibit A attached hereto (a Budget for the Completion Work, and a detailed schedule of values). The Contractor shall submit progress payment applications against the Budget as set forth in Paragraph 5. The Contractor agrees to construct the Completion Work in accordance with the requirements set

forth on Exhibit A and the reasonable construction industry standards and practices for contractors building Class "A" multi-family apartment projects in similar locations (the "Project Standard"). The Completion Work shall be consistent with the fit and finish of completed units that the Owner has already inspected. The Contractor shall supervise and direct the Work, using the Project Standard of care, skill and attention. The Contractor shall be solely responsible for, and have control over, construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Completion Work.

4.      Completion Time. Contractor agrees to Substantially Complete the Completion Work identified in Exhibit A on or before one hundred eighty (180) days from the Contractor's receipt of the Notice to Proceed (the "Completion Time"). "Substantial Completion" shall mean the Project is ready to occupy, when the Owner can occupy and use the Project for its intended purpose, and the local governmental body gives written acceptance (Certificate of substantial completion, Temporary Certificate of Occupancy or equivalent) allowing Owner to occupy and use the Project for its intended purpose. Further, the Contractor shall be entitled to a reasonable extension of time if it encounters adverse weather conditions which will be documented monthly in the Progress Payment Applications as an extension to the remaining work days. If adverse weather conditions are the basis for a claim for additional time, such claim shall be documented by data substantiating that weather conditions were abnormal for the period of time, could not have been reasonably anticipated and had an adverse effect on the scheduled construction. Moreover, the Contractor shall be entitled to a reasonable extension of time if the Contractor is delayed by labor disputes, fire, unusual delay in deliveries, unavoidable casualties or other causes beyond the Contractor's control. Finally, the Contractor shall be entitled to a reasonable extension of time if the Contractor is delayed at any time in the commencement or progress of the Completion Work, that delays the date of Substantial Completion, by an act or neglect of the Owner, or of an employee of Owner, or by a separate contractor employed by the Owner, or by changes ordered by Owner in the Work (the "Owner Caused Delay"). If an Owner Caused Delay occurs or if Owner suspends Contractor's Completion Work by no fault of the Contractor, then Owner shall pay Contractor's extended general conditions in the daily rate identified in Exhibit A, plus any delay damages assessed against the Contractor by its Subcontractors.

5.      Progress Payments. On a monthly basis, Contractor shall prepare and submit to Owner and Lenders' third party inspecting agent an itemized request for payment (the "Progress Payment Application") for Completion Work completed. The Contractor shall attach all pay applications along with lien releases from the Contractor and subcontractors if required by Lender or its title company for the Project for each Progress Payment period. Each Progress Payment Application shall also include any Contractor's fees for overhead and profit as reflected in the approved Budget attached hereto. Each Progress Payment Application shall be delivered to the Owner by the 20th calendar day of each month.   Subject to Owner certifying that Contractor's work is completed, Owner shall pay Contractor within ten (10) business days of receipt of such fully complete Progress Payment Application by Owner so that timely payments to each subcontractor, suppliers and materialmen can be made. In the event payments are drawn from the Loan, such date may be extended by Lender if necessary to complete its standard and customary underwriting in connection with draws under the Loan. Each Progress Payment Application submitted by the Contractor to Owner shall be on an AIA 702/703 form. Each Progress Payment Application may exclude either 5% or 10% retainage owed, in compliance

21266003v.5 147249/00011

with applicable Alabama law. Any retainage that remains unfunded through the Completion Work shall be made in connection with the Final Payment. Contractor represents and warrants to Owner that it will use any payments received from Owner to pay the claims of all laborers, subcontractors and suppliers of equipment and materials on or to the Project.

6.      Final Payment. Final Payment shall be made to Contractor within fifteen (15) days after Final Completion. "Final Completion" means (1) when the Construction Work has been completed, (b) the date of final inspection and final written acceptance by the governmental body that issued the building permit for the Project and issuance of a Certificate of Occupancy or equivalent, and (3) the Punch Work is completed according to the terms of this Paragraph. Contractor shall notify Owner when it believes the Construction Work is Substantially Complete. Owner and Contractor shall then jointly inspect the Completion Work. Following this inspection, Owner shall provide Contractor a reasonable list of items to be completed or corrected (the "Punch Work"). Contractor shall consult with its Subcontractors to ensure the remaining Punch Work is completed. Provided, however, if Contractor disagrees with Owner that any item of Punch Work needs to be completed, this shall not act as a basis to withhold the entire amount the Final Payment. Instead, Owner may withhold only a reasonable amount based on the anticipated cost of the disputed work, and such shall be resolved in accordance with the dispute resolution procedures set forth in Paragraph 16 if required.

7.      Failure of Payment. If the Owner does not pay the Contractor within ten (10) days after the date established in Paragraph 5 (subject to extension as set forth in Section 5 above if the draw is from the proceeds of the Loan), in the amount approved by Owner, then the Contractor may, upon ten (10) additional days' written notice to the Owner, stop the Completion Work until payment of the amount past due has been received. The Completion Time shall be extended appropriately and the Completion Price shall be increased by the amount of the Contractor's reasonable costs of shut-down, delay and start-up, plus any delay damages assessed against the Contractor by its Subcontractor

8.      Liens. If any liens are filed by Contractor's subcontractors, materialmen, or suppliers, Contractor shall (1) cause the lien to be released, or (2) bond around the lien under applicable law. If Contractor fails to cause any filed lien to be released or bonded around within fifteen (15) days following receipt of such notice of lien by the Owner (as set forth in the notice provision set forth in Paragraph 12), then Contractor shall, to the fullest extent permitted by law, indemnify and hold harmless Owner against any and all liabilities associated with any Indemnified Claim, including attorney's fees, disbursements and court costs.

9.      Changes. Owner may make additions to, or subtractions from, the Completion Work identified in the Budget ("Changes"). If Owner requests additions to the Completion Work, beyond that identified in Exhibit A, then Contractor shall, with reasonable promptness, determine the adjustment to the Completion Price and Completion Time necessary to incorporate the proposed modifications into the Completion Work, and submit an itemized quotation documenting the adjustments ("Change Order"). The method used in determining adjustments to the Completion Price shall be a single lump sum price, including a reasonable adjustment for Contractor's overhead and profit not to exceed 15%. In the event that the modifications requested by the Owner delete Completion Work, then Owner shall not be entitled to a credit.

Moreover, in the event the local governmental entity that approved the permitted plans requests Contractor include something into the Project that was not in the approved permitted plans or Exhibit A, then Contractor shall be entitled to an increase in the Completion Price in the amount equal to the actual cost of the additional work, plus 15% overhead and profit. Should this occur Contractor shall work with Owner to determine best steps to a resolution so as not to affect progress of the Completion Work at the Project.

      10.    <u>Failure to Complete Renovation.</u>  In the event Contractor fails to complete the Completion Work as required herein on or before the Completion Time (which is subject to extension as set forth herein), then Owner may, upon written notice to Contractor and Contractor's failure to complete the Completion Work or commence and diligently pursue completion within thirty (30) days after such written notice, Owner may complete any portion of the Completion Work which remains incomplete by Contractor.  Upon Owner's completion of the Completion Work, Owner shall deliver to Escrow Agent, Contractor and Prior Owner, a signed certificate from Owner stating the portion of the Completion Work completed and the amount of costs incurred by Owner ("Owner's Certification"). Within five (5) business days after receiving Owner's Certification, Escrow Agent shall disburse to Owner from the Escrow Deposit the amount evidenced by Owner's Certification.

      11.    <u>Exclusive Warranty.</u>  The Contractor warrants to the Owner that materials and equipment furnished under this Agreement will be of good quality and new unless the Contract Documents require or permit otherwise. The Contractor further warrants that the Project will be free from defects, except for those inherent in the quality of the Work reasonably acceptable in the industry. Work, materials, or equipment not conforming to these requirements may be considered defective. These warranties apply whether or not the Contractor's work was completed on or before the Effective Date.  The warranties shall be for a duration of one (1) year from each phase when occupied by the first resident in that phase of work released under a Temporary Certificate of Occupancy.  Owner must give Contractor prompt and timely notice of any defect under these warranties (as set forth in the notice provision in Paragraph 12).  Upon receipt of such notice, Contractor shall promptly repair any condition that is defective.  Whether such warranty work is the responsibility of the Contractor or a Subcontractor, Sub-subcontractor or a supplier, such warranty work shall be performed at no additional cost or charge to the Owner. The Contractor shall not be liable under this Agreement unless written notice of the warranty issue, including latent defects, shall have been given by Owner to Contractor within the one (1) year warranty period(s). Steps taken by the Contractor to correct any defect or defects shall not act to extend the warranty period(s) described hereunder.  **THESE WARRANTIES ARE OWNER'S SOLE REMEDY AGAINST CONTRACTOR UNDER THIS AGREEMENT, AND IS GIVEN IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR PARTICULAR PURPOSE, WORKMANSHIP, AND HABITABILITY, WHICH ARE ALL HEREBY DISCLAIMED AND WAIVED BY THE OWNER.**  The Contractor's warranty excludes remedy for damage or defect caused by abuse, alterations to the work not executed by the Contractor, improper or insufficient maintenance or upkeep, improper use or operation, or normal wear and tear and usage.

12.    Subcontractor or Supplier Warranties.  In connection with its request for Final Payment, Contractor shall assemble all written warranties from Subcontractors and suppliers and provide same to the Owner in a comprehensive close out binder.  Such warranties are hereby assigned to the Owner for all purposes.

13.    Notice.  Owner's designated representative is:

> Maxus Metropolitan, LLC
> 104 Armour Road
> North Kansas City, MO  64116
> Phone:  (816) 303-4500
> Facsimile:  (816) 221-1829
> Attention:  Adam Fletcher

Contractor's representative is:

> Bomasada BHM Construction LLC
> 8980 Lakes at 610 Drive, Suite 200
> Houston, TX 77054
> Email:  stuartfred@bomasada.com
> Attention:  Stuart L. Fred

Any notice required to be sent under this Agreement shall be sent to the appropriate representative by either (1) by email, (2) hand delivery, (3) Certified Mail, Return Receipt Requested, or (4) a reputable overnight courier.

14.    Insurance.  Contractor shall provide and maintain such types and amounts of insurance as set forth in Exhibit B.

15.    Indemnity.  Contractor shall indemnify, protect, defend and hold harmless the Owner, its respective officers, directors, shareholders, partners, members, managers, employees, consultants and agents (collectively, the "Indemnitees") from and against all claims, liabilities, damages, losses, liens, investigations, causes of action, administrative proceedings, suits, judgments, fees (including, but not limited to, attorneys' fees), and expenses ("Indemnity Claims"), of any nature, kind or description, directly or indirectly, arising out of, caused by, resulting from, or sustained or incurred in connection with (in whole or in part), (a) the Completion Work, (b) Contractor's failure to pay promptly when due for all labor, materials, equipment and services used in connection with the Project, (c) any material breach of or failure to comply with any of the provisions of this Agreement, (d) personal injury or death to any person whatsoever, or injury to or destruction of tangible property, (e) violations of applicable law by Contractor or any of its subcontractors, or (f) mechanics' liens by subcontractors, sub-subcontractors or material suppliers and security interests by suppliers of goods and materials. Provided, however, and notwithstanding anything to the contrary contained herein, Contractor's indemnity obligations under sub-parts (a) and (d) are limited to Indemnity Claims that are caused, in whole or in part, by negligent acts or omissions of Contractor, Contractor's subcontractor, anyone directly or indirectly employed by them or anyone for whose acts

Contractor may be liable. Such indemnity obligation shall not be in derogation or limitation of any other obligation or liability of the Contractor or the rights of the Owner contained in this Agreement or otherwise. This indemnification shall survive the completion of the Completion Work or the termination of this Agreement. Contractor's assumption of liability is independent from and not limited in any manner by any subcontractor's insurance coverage.

16.   <u>Governing Law</u>. The Contract shall be governed by the law of the State of Alabama.

17.   <u>Arbitration/Dispute Resolution</u>.   Any controversy or claim which is solely between Owner and Contractor arising out of or related to this Agreement, or the breach thereof, shall be settled by arbitration, which shall be conducted in Birmingham, Jefferson County, Alabama. Any arbitration shall be conducted in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect, unless the parties mutually agree otherwise. The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof. The parties agree that any dispute with an amount in controversy of less than $250,000 shall be decided by American Arbitration Association Construction Industry Arbitration Rules F-1 to F-14. Contractor shall not be liable to Owner for any consequential or incidental damages which may arise from any Completion Work performed pursuant to this Agreement. This includes, but is not limited to, damages incurred by the Owner for losses of financing, business opportunities or reputation, and for loss of profit.

18.   <u>Cleaning Up</u>. The Contractor shall keep the Project and surrounding area free from accumulation of waste materials or rubbish caused by operations.   At completion of the Completion Work, the Contractor shall remove waste materials, rubbish, the Contractor's tools, construction equipment, machinery and surplus materials from and about the Project.

*(Remainder of Page Intentionally Left Blank]*

Bomasada BHM Construction, LLC

By: _____

Its: _____


Maxus Metropolitan, LLC

By: _____        *Ryan Snyder*
       *Ryan Snyder*

Its: *Vice Presdt  G.P. of*   *√√*
      *sole member*

Bomasada BHM Construction, LLC

By: _____

Its: _____

Maxus Metropolitan, LLC

By: _____

Its: _____

21266003v.4 147249/00011

# EXHIBIT A

COMPLETION WORK BUDGET



**Bomasada BHM Construction LLC**
**Completion Budget**
**Sept 1, 2018  to Mar 1, 2018**
EXHIBIT to Construction Agreement

| Cost Codes | Description | Budget | Notes |
|---|---|---|---|
| 18100 | Contingency | | Contingency |
| 18700 | Builder's Risk/Gen Liability | | Estimate |
| 18700 | Contractors fee | | Contractors fee |
| | **CONTINGENCY AND FEE** | | |
| | | | |
| 1000 | **GENERAL CONDITIONS** | | |
| 1005 | Gas & Oil Expense | | Disiel Tank |
| 1015 | Rough Clean-Up | | Rental equipment, labor, and trash |
| 1030 | Jobsite Tear Down | | Office trailer breakdown and site clean-up |
| 1040 | Postage & Freight | | FedEx avg $183 per month in 2018 |
| 1050 | Office Expense & Supplies | | Office Depot avg $100/mo |
| 1055 | Estimating & Blueprinting | | Plan copies |
| 1068 | Copier Rental | | Well Fargo & Kyocera monthly rental fees |
| 1077 | Construction Photographs | | 1 mo. construction photos =ft |
| 1085 | Relocation Expense- Temp Living | | Woody Robertson $1,600/mo - Sept Paid |
| 1095 | Office Rental | | Office Trailer $1,326.06/mo |
| 1096 | Off Property Leasing | | Trailer Rent $1,500/mo - Sept Paid |
| 1100 | Equipment Rental | | Forklift Rental - jobsite cleanup/move material/etc. |
| 1121 | Remediation | | Potential water damaged lumber/sheetrock |
| 1135 | Temp. Storage Trailers | | Mobile Mini avg $288/mo |
| 1145 | Construction Travel Expense | | Travel avg. |
| 1150 | Temporary Water & Sewer | | Turning phases |
| 1155 | Unit Checkout Power | | Turning phases |
| 1162 | Permits/Fees | | GC City, State, & County renewal |
| 1165 | Temporary Electrical(Utilities) | | Job trailer / temp power pole |
| 1175 | Ice, Cups, & Coffee | | Crystal Springs avg $45/mo |
| 1180 | Job Toilets | | HHN Sanitation |
| 1190 | Punch List (Material) | | Nails, etc. |
| 1192 | Punch List (Labor) | | Punch crews |
| 1225 | Project Manager | | 4 months |
| 1230 | Project Secretary | | 4 months |
| 1240 | Superintendent | | 4 months |
| 1245 | Asst. Superintendent (2ea) | | 4 months |
| 1255 | Field Secty/Clerk | | 4 months |
| 1270 | Payroll Tax | | 4 months |
| 1275 | Workmen's Comp | | 4 months |
| 1280 | Health Insurance | | 4 months |
| 1295 | Corporate Overhead | | 4 months |
| 1320 | Specialty Consultant Fee | | CPA |
| 1410 | Travel-Admin | | 6 months |
| 1475 | Bank Service Charges | | 5 - stop pmt fees for $30/each |
| 1485 | Legal | | Various legal fees |
| 1505 | Taxes-Corporate | | 2017 & 2018 estimated tax |
| | **GENERAL REQUIREMENTS** | | |
| | | | |
| 2000 | **SITE CONSTRUCTION** | | |
| 2003 | Sitework Turnkey | | Retainage on original and remaining work including balance to complete |
| 2045 | Soils Testing | | |
| 2095 | Excavation - Dispose of Excess | | Retainage on original and remaining work including balance to complete |
| 2142 | Outdoor Amenities | | Retainage on original and remaining work including balance to complete |
| 2200 | Sidewalks | | Retainage |
| 2215 | Unit Pavers | | Retainage |
| 2280 | Landscaping | | Retainage on original and remaining work including balance to complete |
| 2292 | Transformer Pad/Vault | | Retainage only |
| | **SITE CONSTRUCTION** | | |
| | | | |
| 3000 | **CONCRETE** | | |
| 3003 | CONCRETE - TURNKEY | | |
| 3061 | Core Drilling | | Additional Concrete Drilling / Saw Cutting |
| 3070 | Gypsum Underlayment | | Retainage on original and remaining work including balance to complete |
| | **CONCRETE/PARKING DECK** | | |
| | | | |
| 4000 | **MASONRY** | | |
| 4003 | Turnkey Masonry | | Remaining Contract Balance including retainage |
| | **MASONRY** | | |
| | | | |
| 5000 | **METALS** | | |
| 5003 | STEEL TURNKEY | | Remaining Balances & Retainage |
| 5030 | Steel Handrails And Railing | | Retainage on original and remaining work including balance to complete |
| | **METALS** | | |
| | | | |
| 6000 | **WOOD & PLASTICS** | | |
| 6010 | Framing Lumber Materials | | Misc Lumber to Complete |
| 6015 | Framing Hardware/Accessories | | Misc Hardware to Complete |

**Bomasada BHM Construction LLC**
Completion Budget
Sept 1, 2018 to Mar 1, 2018
EXHIBIT to construction agreement

| Cost Codes | Description | Budget | Notes |
|---|---|---|---|
| 6049 | Finish Carpentry- Turnkey | | Retainage on original and remaining work including balance to complete |
| 6050 | Finish Carpentry- Materials | | Retainage on original and remaining work including balance to complete |
| 6070 | Clubhouse Upgrade Allowance | | Retainage on original and remaining work including balance to complete |
| 6085 | Cabinets Turnkey | | Retainage on original and remaining work including balance to complete |
| 6090 | Countertops | | Retainage on original and remaining work including balance to complete |
| 6999 | Framing Supplements | | Retainage on original and remaining work including balance to complete |
| | **WOOD & PLASTICS** | | |
| | | | |
| 7000 | **THERMAL/MOISTURE PROTECTION** | | |
| 7010 | Roofing | | Retainage on original and remaining work including balance to complete |
| 7020 | Building Insulation | | Retainage on original and remaining work including balance to complete |
| 7048 | Applied Fire Proofing | | Retainage |
| 7070 | Firestopping | | Retainage |
| 7075 | Joint Sealants (Caulk) | | Additional Caulking Needed |
| | **THERMAL/MOISTURE PROTECTION** | | |
| | | | |
| 8000 | **DOORS & WINDOWS** | | |
| 8011 | Wood Door Units | | Retainage on original and remaining work including balance to complete |
| 8040 | Metal-Framed Storefronts | | Retainage on original and remaining work including balance to complete |
| 8045 | Aluminum/Vinyl Windows | | PO Balance |
| 8070 | Door Hardware | | PO Balance for hardware |
| | **DOORS & WINDOWS** | | |
| | | | |
| 9000 | **FINISHES** | | |
| 9015 | Gypsum Board/ Drywall | | Retainage on original and remaining work including balance to complete |
| 9016 | FLOORING TURNKEY | | Retainage on original and remaining work including balance to complete |
| 9090 | Painting- Interior & Exterior | | Retainage on original and remaining work including balance to complete |
| 9091 | Final Cleaning Units | | Retainage on original and remaining work including balance to complete |
| | **FINISHES** | | |
| | | | |
| 10000 | **SPECIALTIES** | | |
| 10085 | Toilet Accessories | | Bath Hardware |
| 10105 | Trash Chute | | Retainage |
| 10108 | Wire Shelving Units | | Wire Shelving |
| | **SPECIALTIES** | | |
| | | | |
| 11000 | **EQUIPMENT** | | |
| 11003 | Turnkey Appliances | | Appliances Whirlpool |
| | **EQUIPMENT** | | |
| | | | |
| 12000 | **FURNISHINGS** | | |
| 12020 | Window Treatments | | Retainage on original and remaining work including balance to complete |
| | **FURNISHINGS** | | |
| | | | |
| 13000 | **SPECIAL CONSTRUCTION** | | |
| 13025 | Swimming Pools | | Retainage on original and remaining work including balance to complete |
| | **SPECIAL CONSTRUCTION** | | |
| | | | |
| 14000 | **CONVEYING SYSTEMS** | | |
| 14003 | Turnkey Elevators | | Retainage on original and remaining work including balance to complete |
| | **CONVEYING SYSTEMS** | | |
| | | | |
| 15000 | **MECHANICAL** | | |
| 15007 | Fire Sprinkler (Units) | | Retainage on original and remaining work including balance to complete |
| 15011 | Kitchen Sinks | | ADA Sinks |
| 15015 | Sub Water Metering System | | Retainage on original and remaining work including balance to complete |
| 15020 | HVAC (Units) | | Retainage on original and remaining work including balance to complete |
| 15999 | Plumbing Supplements | | Retainage on original and remaining work including balance to complete |
| | **MECHANICAL** | | |
| | | | |
| 16000 | **ELECTRICAL** | | |
| 16003 | Turnkey Electrical | | Retainage on original and remaining work including balance to complete |
| 16035 | Light Fixtures (Units) | | Remaining Balance |
| 16036 | Light Fixtures (Exterior) | | Remaining Balance |
| | **ELECTRICAL** | | |
| | | | |
| | TOTAL GENERAL CONDITIONS | | Contingency and Fee / General Conditions |
| | TOTAL HARD COST | | Hard Costs |
| | **TOTAL COST TO COMPLETE** | | |

## EXHIBIT B

Contractor shall purchase from and maintain in a company or companies lawfully authorized to do business in Alabama.  Such insurance as will protect the Contractor from claims set forth below which may arise out of or result from the Contractor's operations and completed operations, whether such operations are by the Contractor or by a Subcontractor or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable:

.1   Claims under workers' compensation, disability benefit and other similar employee benefit acts that are applicable to the Completion Work to be performed;

.2   Claims for damages because of bodily injury, occupational sickness or disease, or death of the Contractor's employees;

.3   Claims for damages because of bodily injury, sickness or disease, or death of any person other than the Contractor's employees;

.4   Claims for damages insured by usual personal injury liability coverage;

.5   Claims for damages, other than to the Completion Work itself, because of injury to or destruction of tangible property, including loss of use resulting therefrom;

.6   Claims for damages because of bodily injury, death of a person or property damage arising out of ownership, maintenance or use of a motor vehicle; and

.7   Claims for bodily injury or property damage arising out of completed operations.

The insurance required shall be written for not less than the following limits of liability:

Commercial General Liability:  $1,000,000 Per Occurrence; 2,000,000 Aggregate.

Worker's Compensation and Employer's Liability:   Each Accident $1,000,000; Policy Limit $1,000,000; Each Employee $1,000,000

The insurance shall be maintained without interruption from the date of commencement of the Completion Work until the date of Final Payment and acceptance of the Project by Owner and termination of any coverage required to be maintained after Final Payment, and, with respect to the Contractor's completed operations coverage, until the expiration of the period for correction of Completion Work or for such other period for maintenance of completed operations coverage as specified in the Agreement.

Certificates of insurance acceptable to the Owner shall be filed with the Owner prior to commencement of the Completion Work and thereafter upon renewal or replacement of each required policy of insurance. An additional certificate evidencing continuation of liability coverage, including coverage for completed operations, shall be submitted with the Final Application for Payment.

The Contractor shall cause the commercial liability coverage required by the Contract to include (1) the Owner as additional insureds for claims caused in whole or in part by the Contractor's negligent acts or omissions during the Contractor's operations; and (2) the Owner as an additional insured for claims caused in whole or in part by the Contractor's negligent acts or omissions during the Contractor's completed operations.

21376699v.1

The Owner shall be responsible for self-insuring, or for purchasing and maintaining the Owner's usual liability insurance.

<u>Property Insurance</u>.  The Contractor shall cause the current property insurance to be extended through the Competition Work.  The Owner shall be a named insured.

The Contractor shall maintain, in a company or companies lawfully authorized to do business in Alabama, property insurance written on a builder's risk "all-risk" or equivalent policy form in the amount of the Prior Construction Contract Sum, plus value of subsequent Completion Work and cost of materials supplied or installed by others, comprising total value for the entire Project at the site on a replacement cost basis without optional deductibles. The Owner shall pay Contractor the cost of the extension of the builder's risk "all-risk" property insurance, and such shall be a line item on Exhibit A to the Agreement.  Such property insurance shall be maintained, until Final Payment has been made as provided in Paragraph 6 of the Agreement.

Property insurance shall be a self-insurance program or on an "all-risk" or equivalent policy form and shall include, without limitation, insurance against the perils of fire (with extended coverage) and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, earthquake, flood, windstorm, falsework, testing and startup, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for Contractor's services and expenses required as a result of such insured loss.

If the Owner requests in writing that insurance for risks other than those described herein or other special causes of loss be included in the property insurance policy, the Contractor may, in its sole discretion, include such insurance, and the cost thereof shall be charged to the Owner by appropriate Change Order to the Agreement.

If the property insurance requires deductibles, the Owner shall pay costs not covered because of such deductibles.

This property insurance shall cover portions of the Work stored off the site, and also portions of the Work in transit.

The Completion Work shall be completed in phases, and partial occupancy of the Project may occur. The Owner and the Contractor shall take reasonable steps to obtain consent of the insurance company or companies and shall, take no action with respect to partial occupancy or use that would cause cancellation, lapse or reduction of property insurance.

As the Completion Work is completed in phases, and residents begin to occupy certain portions of the Project, the Owner shall purchase and maintain liability insurance to cover against personal injury or property damage to these occupied areas of the Project.

If the Project is damaged, in whole or in part, by fire or other casualty, Owner agrees that Contractor will be hired to rebuild Project.  Owner agrees to pay Contractor's services and

expenses required as a result of such work whether or not the loss is covered by the property insurance described herein.

<u>Waivers of Subrogation</u>.  The Owner and Contractor waive all rights against (1) each other and any of their Subcontractors, Sub-subcontractors, agents and employees, each of the other, and (2) separate contractors, if any, and any of their subcontractors, sub-subcontractors, agents and employees, for damages caused by fire or other causes of loss to the extent covered by property insurance obtained or other property insurance applicable to the Completion Work.  The Owner or Contractor, as appropriate, shall require of the Subcontractors, Sub-subcontractors, agents and employees of any of them, by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, and did not pay the insurance premium directly or indirectly. Notwithstanding any provision to the contrary in this paragraph, Owner shall not waive its rights of subrogation for any claims or damages arising from the negligent or intentional acts of Contractor, its Subcontractors, Sub-subcontractors, employees, agents, and others retained by or associated with the Contractor for performance of the Completion Work.

A loss insured under the Contractor's property insurance shall be adjusted by the Contractor and made payable to the Owner for the insureds, as their interests may appear, subject to requirements of any applicable mortgagee clause. The Contractor shall pay Subcontractors their just shares of insurance proceeds received by the Contractor, and by appropriate agreements, written where legally required for validity, shall require Subcontractors to make payments to their Sub-subcontractors in similar manner.

21376699v.1